184 Cal.App.4th 1249 (2010)
109 Cal.Rptr.3d 792
S.M., Plaintiff and Appellant,
v.
E.P., Defendant and Respondent.
No. D055230.
Court of Appeals of California, Fourth District, Division One.
May 25, 2010.
*1251 Honey Kessler Amado for Plaintiff and Appellant.
Judith E. Klein for Defendant and Respondent.

OPINION
AARON, J.

I.

INTRODUCTION
Appellant S.M. and respondent E.P. are the parents of a toddler, C.M. S.M. and E.P. met in San Diego and lived together in San Diego, on and off, for approximately five years before C.M. was born. In 2008, around the time E.P. became pregnant with C.M., the couple began having difficulties, and E.P. eventually returned to her home state of Iowa to give birth. She returned to San Diego a few months later with C.M. so that she and S.M. could work on their relationship.
Approximately eight months after C.M. was born, S.M. filed a paternity and custody action in California. Approximately two weeks later, E.P. filed a motion to quash service of summons in the California action and sought a restraining order against S.M. E.P. also filed a custody and support action in Iowa.[1]
The trial court issued a minute order in which the court stated that it would decline to exercise jurisdiction over the paternity and custody matter, concluding that "Iowa is the proper [s]tate of jurisdiction." The court also issued *1252 a separate restraining order that prohibited S.M. from coming within 100 yards of E.P. for a period of six months.
On appeal, S.M. raises two contentions. First, S.M. contends that the trial court erred in concluding that "Iowa is the proper [s]tate of jurisdiction." According to S.M., the trial court should have exercised jurisdiction over the paternity and custody dispute because, among other things, (a) at the time of the hearing, neither California nor Iowa could be considered C.M.'s "home state" under the Uniform Child Custody Jurisdiction and Enforcement Act (the UCCJEA) (Fam. Code,[2] § 3400 et seq.); (b) C.M. had more significant connections with California than with Iowa; and (c) at the time S.M. filed his custody action in California, E.P. had not yet filed the custody action in Iowa.
Second, S.M. challenges the restraining order. S.M. contends that the trial court abused its discretion in issuing the restraining order because there was no showing that he engaged in domestic violence against E.P.
After the parties had completed their briefing on appeal, the parties notified the court that they had reached a custody settlement in an Iowa court, and that S.M. had acceded to the Iowa court exercising jurisdiction over custody and support issues. S.M. requested that this court dismiss his appeal, in view of the Iowa settlement. However, soon thereafter, S.M. retracted his request for dismissal. E.P. then sought to have the appeal dismissed.
This court requested supplemental briefing on the issue of the propriety of dismissing S.M.'s appeal. The supplemental briefs made it clear that S.M. is no longer challenging the trial court's refusal to exercise jurisdiction over the paternity and custody dispute, but that he continues to challenge the issuance of a restraining order.
We conclude that S.M.'s concession to the Iowa court's exercising jurisdiction over his paternity and custody dispute with E.P. renders moot S.M.'s appeal from the trial court's minute order deferring jurisdiction over the custody dispute to an Iowa court. However, the portion of S.M.'s appeal in which he challenges the restraining order was not rendered moot by his agreement to allow an Iowa court to take jurisdiction of the custody dispute.
We further conclude that the trial court abused its discretion in issuing the restraining order against S.M. because in issuing the order, the court misapplied the statutory requirements and misapprehended the legal effect of the order. We therefore reverse the restraining order.

*1253 II.

FACTUAL AND PROCEDURAL BACKGROUND
E.P. moved from Iowa to California after graduating from college in summer 2003. Not long after she moved to California, E.P. met S.M. and they began to date. E.P. and S.M. had an on-again, off-again relationship over a five-year period. Late in the relationship, E.P. became pregnant. Prior to the child's birth, S.M. filed an action in a California court to establish paternity, and sought an ex parte order preventing E.P. from moving to Iowa before giving birth. The court denied S.M.'s request for a restraining order, stating, "The court finds this is not an emergency. You [S.M.] need to file your O.S.C. in due course. The court has no jurisdiction to prevent mother from traveling. That is the court's order ...."
E.P. decided that she wanted to give birth to C.M near her family in Iowa. C.M. was born in August 2008 in Iowa City, Iowa. On August 11, E.P. filed a request for child support through the Iowa Department of Human Services. In September 2008, both parties signed a document entitled "STIPULATION RE: CHILD CUSTODY[] AND VISITATION." The stipulation provided in part, "The parties[] agree that Iowa shall have home state jurisdiction over the child pursuant to the UCCJEA as the child was born in Iowa."[3]
E.P. returned to California with C.M. on November 12, 2008. E.P. resumed her work as a nurse at a hospital in San Diego, and she and C.M. moved in with S.M. and S.M.'s three children from a previous marriage.[4] On January 6, 2009, while still living in California together, S.M. and E.P. both signed a "VOLUNTARY PATERNITY AFFIDAVIT," which appears to be a form provided by the Iowa Department of Public Health.
In early April 2009, E.P. indicated to S.M. that she would be traveling to Iowa to attend a baby shower on April 24, and that she planned to take C.M. with her. E.P. also told S.M. that she wanted to move back to Iowa at some point in time after the baby shower.
*1254 On April 16, 2009, S.M. filed another action in California to establish paternity and custody.[5] E.P. was served with a summons in the action on April 21. The back page of the summons included a "STANDARD RESTRAINING ORDER" that provides: "You and the other party are restrained from removing from the state the minor child or children for whom this action seeks to establish a parent-child relationship without the prior written consent of the other party or an order of the court."
E.P. refused to discuss the issue of the summons and restraining order whenever S.M. attempted to talk with her about it, and she continued to plan her trip to Iowa. S.M.'s attorney had "drawn up" a stipulation that S.M. wanted E.P. to sign, which provided that E.P. would agree to bring C.M. back to California after her trip to Iowa. E.P. refused to sign the stipulation. E.P.'s refusal to sign caused S.M. to become concerned that E.P. might not return C.M. to California.
Early in the morning on April 23, 2009, E.P. and S.M. had an argument. E.P. confirmed her intention to leave for Iowa with C.M. later that day, despite the terms of the standard restraining order that was issued with the summons in the paternity and custody action. The parties argued, and E.P. eventually called the police. At least two police officers arrived at S.M. and E.P.'s residence and spoke with the parties for approximately an hour. The officers ultimately arrested S.M. when he said that he did not want E.P. to take C.M. out of the house.[6]
On April 23, 2009, E.P. flew to Iowa with C.M. to attend the baby shower. On April 24, 2009, E.P. filed a motion in the California court to quash summons. In her motion, E.P. argued that California does not have jurisdiction to determine the paternity and custody of C.M. E.P. also sought a restraining order against S.M., based on the incident that occurred in the early morning hours of April 23. In her request for a restraining order, E.P. described "the most recent abuse" committed by S.M. as follows: "He woke me up. Tore off the covers and said, `I'll kill you.' He then called me a `cold bitch.' When the police came he was arrested ...."
The court held an ex parte hearing on April 24. The court entered an order shortening time for hearing E.P.'s motions, set a hearing for May 4, and ordered E.P. to return to California with C.M. for the May 4 hearing.
*1255 On April 30, E.P. filed an action in the Iowa District Court for Floyd County to establish custody and child support. (E.P. v. S.M., Iowa District Court for Floyd County, case No. DRCV029319.)
The trial court held the hearing on E.P.'s motion to quash and her request for a restraining order on May 4. The parties agreed that neither California nor Iowa could be considered C.M.'s "home state" under the UCCJEA because C.M. had not lived in either state for six consecutive months. After the hearing that day, the court filed a document entitled "Restraining Order After Hearing (Order of Protection)" against S.M. The order had an expiration date of November 3, 2009. The six-month restraining order named E.P. as the "[p]rotected person." S.M. was listed as the "[r]estrained person," and he was ordered not to "[h]arass, attack, strike, threaten, assault... hit, follow, stalk, molest, destroy personal property, disturb the peace, keep under surveillance, or block movements; [¶] [c]ontact ..., telephone, or send messages or mail or e-mail ...; [¶] [t]ake any action, directly or through others, to get the addresses or locations of any protected persons or their family members, caretakers, or guardians." The order also required S.M. to "stay at least 100 yards away from" E.P.
On May 5, the trial court issued a minute order concerning the jurisdictional question. The minute order stated that the court had spoken with the court in Floyd County, Iowa, to discuss the matter of jurisdiction over the case, and had concluded that Iowa, and not California, should have jurisdiction over the paternity and custody matter between E.P. and S.M. The court stated that E.P. would be permitted to "return to Iowa at any time."
On May 26, 2009, S.M. filed a timely notice of appeal from the court's May 4 restraining order and the May 5 minute order. The parties completed their appellate briefing on November 29, 2009.

III.

DISCUSSION

A. The jurisdictional issue has been rendered moot by the parties' stipulated agreement to proceed in an Iowa court

1. Additional background

In his opening brief, S.M. argued that the trial court erred in refusing to exercise jurisdiction over the parties' custody dispute. After the parties filed their briefs on appeal, they notified this court that they had entered into a stipulated settlement in an Iowa court. Pursuant to that settlement, the parties *1256 agreed that the Iowa court would exercise jurisdiction over their custody dispute. On January 12, 2010, counsel for S.M. filed "Appellant's Notice of Settlement and Request for Dismissal," in this court. That document stated that the parties had settled the issues on appeal, and requested that this court dismiss the appeal. On January 15, this court received a letter from counsel for E.P. stating that E.P. joined in S.M.'s request for dismissal of the appeal.
On January 21, before this court had entered an order dismissing the appeal, counsel for S.M. filed "Appellant's Request to Withdraw Notice of Settlement and to Withdraw Request for Dismissal and Order Thereon." Counsel for S.M. claimed that the settlement to which counsel had referred in the request for dismissal was "unraveling." On January 27, counsel for E.P. filed "Respondent's Opposition to Withdraw Request for Dismissal and Order Thereon/Request to Dismiss Appeal," in which counsel argued that the parties had entered into a binding settlement agreement, and that the settlement agreement renders the appeal in this court moot.
On February 9, 2010, counsel for E.P. filed a document entitled "Request for Judicial Notice and to Dismiss Appeal." Counsel requested that this court take judicial notice of a decree entered by the Iowa District Court for Floyd County. A document entitled "Decree" was attached to the request, but the document was not certified or file stamped. On February 16, counsel for E.P. filed a certified copy of the decree from the Iowa District Court. The decree incorporated, and included a certified copy of, a transcript of the relevant proceedings in the Iowa court from January 6, 2010.
In response to the parties' various motions and requests, on February 18, 2010, this court requested that the parties submit supplemental briefs addressing whether the appeal in this case should be dismissed. Specifically, this court asked the parties to address the following questions:
"1. Should this court consider Respondent's January 27 filing to be a request to dismiss the appeal, and if so, should the court grant the motion? In responding to this question, please address the propriety of this court taking judicial notice of the Decree from the Iowa District Court, and the effect of the Decree on the question whether the appeal should be dismissed.
"2. Should this court consider the dismissal issue with the appeal, or [are] there exceptional circumstances that support earlier consideration of the issue?"
*1257 Both parties filed a supplemental brief.[7]

2. Analysis

The decree of the Iowa District Court for Floyd County[8] includes the following provision: "As to additional matters, the Court notes that the parties agree, and specifically [S.M.] agrees to the jurisdiction of the Iowa Court, and that by operation of law, shall have the effect of a dismissal of the California appeal regarding child custody of [C.M.], and [S.M.] shall take affirmative steps in California to request a dismissal of the California appeal." A transcript of the court proceeding from January 6, 2010, is attached to the decree and is incorporated in the decree by reference.
(1) We conclude that the decree of the Iowa District Court for Floyd County, as well as S.M.'s concession in his supplemental briefing in this court, establish that S.M. is no longer challenging the trial court's May 5 minute order deferring jurisdiction over paternity and custody issues to an Iowa court. We therefore dismiss as moot S.M.'s appeal from the May 5 minute order. (See Ebensteiner Co., Inc. v. Chadmar Group (2006) 143 Cal.App.4th 1174, 1178 [49 Cal.Rptr.3d 825] ["Generally, courts decide only `actual controversies' which will result in a judgment that offers relief to the parties. [Citations.] Thus, appellate courts as a rule will not render opinions on moot questions ...."].)

B. The trial court abused its discretion in issuing a restraining order against S.M. under Family Code section 6300

S.M. challenges the trial court's issuance of a restraining order against him. The restraining order is separately appealable as an order granting an *1258 injunction (see Code Civ. Proc., § 904.1, subd. (a)(6)), and there is nothing in the Iowa court decree that suggests that S.M. agreed to dismiss his challenge to the restraining order.[9]

1. Additional background

At the hearing on May 4, 2009, E.P. testified that early in the morning on April 23, C.M. woke up and began crying. S.M. "came in to help soothe the baby." According to E.P., "The baby went back to sleep, and [S.M.] started to question me on my trip back to Iowa." When asked what happened next, E.P. said, "He continued to badger me, telling me he was going to call the police when I got to the airport stating that I was kidnapping our son, when I had purchased the ticket March 10th for a round-trip ticket. [¶] ... [¶] The conversation escalated. He continued to tell me that he had that restraint [i.e., the standard restraining order issued with the summons in the paternity action]. I said I had talked to my attorney." E.P.'s attorney stopped her at that point, and asked her, "Then what happened. [¶] I'm wanting you to kind of focus on action and words between you and [S.M.]." E.P. responded, "The conversation heated. He ripped off the covers of my bed and said, [']I'll kill you.[']" E.P.'s attorney stopped her again and asked E.P. to explain where she was in the house at the time these events were unfolding.
After describing where she had been in the house, E.P. then testified, "I told him multiple times, I said calm[ly], I said, [`]I really do not want to discuss this right now. Can we please go back to sleep? I have an early flight.['] And he said, [`]No, we are not going to go back to sleep.['] He turned on the hallway light and would not give me back the covers at all." E.P. also testified that S.M. called her "names," including "[c]old bitch" and "spoiled brat." E.P. called S.M.'s sister at around 3:33 a.m., because E.P. "didn't want to directly call the police" and "thought maybe she could calm him down." When asked why she was going to call the police, E.P. responded, "Because he had threatened my life." E.P.'s attorney asked, "Were you afraid?" E.P. responded, "I was at the moment, yes."
E.P. said that she spoke with S.M.'s sister only briefly, and that the call was disconnected. S.M. continued to call E.P. names like "cold bitch" and "spoiled brat." He told her to "go ahead and call the police" because he was "going to call them anyways in the morning." E.P. asked S.M. to leave the room, but he would not, so she called the police.
E.P. testified on cross-examination that S.M. had never threatened to hurt her before, and that he had never "been physical with" her. She had never *1259 known S.M. to threaten physical harm to anyone, other than the threat that she said he made on this occasion. The baby, who was in the same room as E.P. and S.M. that morning, remained asleep throughout the incident. S.M.'s three other children, who were also in the house that night, also slept through the argument, until they were awakened just prior to S.M. being placed under arrest.
S.M.'s attorney asked E.P., "Did the police make any comment to you prior to arresting [S.M.] that they planned on arresting him?" E.P. responded, "Yes," and explained, "They just said they would if he continued to talk out of line. He was not obeying what they were saying." S.M.'s attorney sought clarification, asking E.P., "It was only if he continued to talk out of line they expressed their intent to arrest him, correct?" E.P. said, "No. When he was saying that I could not leave the house, that's when they started speaking up."
S.M. testified that he had discussed with E.P. "the restraining order contained on the summons which prevent[ed] her from leaving the state with the baby." When asked how E.P. responded when S.M. pointed out the terms of that restraining order to her, S.M. said, "Angrily and just pretty much ignoring what I would say, not even making any response.... [B]asically ignoring the whole issue." According to S.M., he got up in the early morning hours of April 23, gave the baby a bottle, and went back to sleep. S.M. explained that there "ended up being an argument, but it started with me telling her that it wasn't just about [C.M.], that I wanted her to stay and live here. And she said, [`]Oh, it's always that way with you when I get ready to leave,['] or something like that." When asked how the conversation progressed, S.M. said that he asked E.P. what incentive she had to bring C.M. back to California, and she acknowledged that she had none. S.M. said that he responded, "I'm going to stop you from taking him. I'm going to call the police in the morning to keep you from taking [C.M.] to Iowa."
At first, E.P. told S.M. to "go ahead" with his plan to call the police in the morning, but then said that she was going to call the police. S.M. told her to "go ahead" and call the police, and E.P. said that she would tell the police that S.M. had hit her. S.M. again told E.P. to go ahead and call the police because he was going to call them anyway. E.P. called S.M.'s sister first, and then called the police. When E.P. called the police, she told the person who answered her call that S.M. had threatened to kill her.
S.M. testified that both before and after E.P. made these telephone calls, he had said to her, "I'm sleeping in the bed, and you can go out to the couch, or you can leave the house, either one." He further testified, "I never tried to stop her. I wanted her to leave. I was trying to reconcile in some way. So I told her to leave and go out on the couch."
*1260 After E.P. called the police, S.M. called his sister to tell her "what was going on." According to S.M., when the police arrived, "immediately they were hostile to me. I was not enraged. I was on the phone with my sister the whole time, but I was not enraged. I was not angry. They were right away hostile. They wouldn't let me say one word. Then they were asking [E.P.] what happened. And I would try and speak, and they would just, you know: [`]Shut up; you're going to go to jail,['] that kind of thing, right away." S.M. testified that he kept his sister on the telephone because he "was scared that [he] was going to be arrested, that this whole thing was going to be taken out of control, that [E.P.'s] statements were going to be believed ...."
S.M. testified that when the police officers told E.P. that under the terms of the standard restraining order issued with the summons in S.M.'s paternity action, she could not take the baby out of the state, E.P. responded, "Well, my lawyer said I could." According to S.M., the officers told E.P. that she had "got[ten] bad advice," but also told her that she could leave the house, because there was nothing in that restraining order that prevented her from taking the baby out of the house. S.M. indicated that he did not want E.P. to take the baby out of the house because it was 4:00 a.m. and the baby was asleep. S.M. asked, "What if I don't want [C.M.] to leave? Don't I have the same right she does?" According to S.M., the police officers kept telling him that there was nothing to prevent E.P. from taking C.M. out of the house. In response to S.M.'s repeated questioning of the officers as to whether he had the same rights as E.P. regarding C.M. and asking, "[W]hat if I don't let her take him," an officer replied, "Then we have to call the detectives, and they may take the child away from both of you."
The officers told S.M. to wake up his other children. Once the children were awake, officers spoke with each child. At some point, the officers told S.M., "If you don't let [E.P.] take the baby out of this house, we're going to arrest you." S.M. asked, "For what? What did I do?" When the officers responded that S.M. had made a threat, S.M. told the officers, "[T]hat never happened. You guys weren't even going to arrest me until I said I don't want her taking the baby out of the house ...." The officers then placed S.M. under arrest.
On cross-examination, counsel for E.P. asked S.M. if it was his testimony that while the police officers were at his house, he was "just as a calm as a cucumber, and ... just did everything the police said." S.M. responded, "No. That's not my testimony at all, but I did do everything the police said. [¶] So you have two parts to that question. The first one was, no, I wasn't calm as a cucumber. I was very upset, very upset. But I did everything the police told me to do." S.M. admitted that he took off his watch and placed his hands behind his back when an officer told him that his choice was either to let E.P. leave the house with the baby or be arrested.
*1261 S.M.'s sister, with whom S.M. was speaking on the telephone when E.P. called the police, testified that she did not hear S.M. "curse out" E.P. She stated, "[S.M.] was upset. He kept saying, [`S]he is going to take the baby; she is not listening to the court order; I told her thatshe was going to call the police. I said, go ahead.['] He said to me, [']I told her to go ahead and call the police because I'm going to do it in the morning.['] And then in the background I heard her calling the police." S.M.'s sister was asked whether she was on the telephone with S.M. when S.M. "actually got arrested." She testified, "I was on the phoneI didn't know exactly when he got arrested. I heard most everything, and then all of a sudden it went silent, and [E.P.] picked up the phone and said, [']He's being cuffed.[']"
The police report stated that when officers arrived at the home, "[E.P.]'s eyes were glassy and bloodshot and she appeared to have been crying. She did not complain of any pain and she stated that nothing physical had happened between her and [S.M.] [S.M.] was calm but continued to talk and take over the investigation after Officer Alberts repeatedly told him to `calm down and let us investigate.'" The report contained both parties' versions of what had happened that night, including E.P.'s allegation that S.M. had threatened her, and S.M.'s statement that he had never threatened E.P., and that E.P. had told him that she would call the police and tell them that [S.M.] had hit her so that he would be taken to jail.
Later in the report, the reporting officer described the events that led to S.M.'s arrest:
"During the investigation and while trying to resolve the court order issue so both parties could understand, [S.M.] continually interrupted officers and stated how unfair the laws are against men in these cases.... [S.M.] became really irate stating that [E.P.] was not going to take the baby even for the rest of the night. Sergeant Wong ... stated to him, calm down or else you will be placed in handcuffs. [S.M] immediately threw his watch down on the hardwood floor and placed his hands behind his back and stated, `Fine!! Take me to jail then!' He then started to yell for his kids, stating, `Look! See dad get arrested and go to jail.'
"Due to [S.M.] becoming irate and his irrational behavior, I placed handcuffs on him .... He was transported to jail without further incident and remained very calm."
After hearing from both parties about the events of that early morning, the trial court stated:
"It is apparent to me that what we have here are two parents who are very devoted to their child. Neither wants to lose contact with their child. That's *1262 commendable. [¶] You're both intelligent people. [¶] I have no reason to doubt that on the evening of April 23rd, [S.M.] was excitable and behaved with a demeanor in a fashion that was described by the respondent. I based that on several bases: We have the testimony of the respondent. We have a police report that corroborates similar type of behavior, and [S.M.] was understandably agitated here in court at the early part of the proceeding.
"Now, sir, when I say agitated, I don't mean in the most negative connotation of someone who is acting in a violent or rude manner. I detect that you are highly concerned about losing contact with your child, which is certainly commendable. But I can also see how that might engender concern on someone else's part, who in her mind believes the relationship is over.
"I'm going to issue a six-month order. Please understand I do not take in the facts of this caseunless something else happens to change my mind, Mr. Mazzei [i.e., S.M.'s attorney], I don't view this as the kind of restraining order which would tell me pursuant to the Family Code that your client is inappropriate for custody or visitation. Obviously he's got a substantial custody order with three other children. Obviously he cares for this child. Obviously he's engaged in a profession which would suggest responsibility, but we can't have these histrionics. This whole thing needs to calm down.
"I'll make orders or some other judge will be making orders about what happens with [C.M.] I don't know who yet, but we need to be calm about this. So I'm issuing an order for six months.
"The only protected party is your client, Ms. Viviano [E.P.'s attorney] I'm not covering anybody else on this order. I'm not making on this order any custody and visitation order, but I'll address that topic in a moment." (Italics added.)
After some discussion about the effect of the order on S.M.'s ability to own or possess firearms, S.M.'s attorney asked, "Just so we're clear, the court's order is that the Family Code section presumption against custody for one with the restraining order does not apply to this case?" The court responded,
"Oh, no, I'm not making that order. I'm articulating to you my thoughts sitting here today, and I caution that with assuming there is no other incident or outbursts or pattern of behavior that would suggest to me that I'm wrong. I'm thinking this evolved in a very unfortunate way, that these two parties she was bent on going to this shower or whatever it was for a week in Iowa, didn't want to sign another document saying she was returning[,] but she was going to return. She had a round-trip ticket. Yet she thinks, the relationship is *1263 over, and maybe she is going to want to move to Iowa. He's frantic because he thinks he's never going to see his son again. I can see how all this evolved. But if there are more incidents of this sort of behavior, I may call the presumption into play.
"I'm saying, sitting here today, I'm not likely to do that. So your client needs to calm down.
"We are now going to be making some orders. It's really unusual for police to come out to a home of parties like this and basically g[e]t pushed into no way out but to arrest somebody. And the person who got arrested was your client. I think that having seen so many of these cases on the criminal and family law side, it's pretty apparent they felt it was the only way to diffuse the situation in this way." (Italics added.)
S.M.'s attorney then sought further clarification from the court, asking, "A point of clarification, [is] the court making a finding as to whether or not [S.M.] actually made a death threat or his behavior was out of control enough that it caused reasonable concern?" The court clarified:
"I'm not making a finding there was a death threat. I'm making a finding there was a very negative comment, that there was an argument, and essentially he wouldn't stop and was badgering her. That seems pretty obvious. And so as a result of this behavior, which she herself described as not the common thing for him to do, she became afraid.
"Having witnessed this behavior in court, having seen the police report which basically substantiated the same kind of behavior, I'm satisfied he behaved that way.
"I think he's frantic right now. He needs to recognize the system will go through its work. There will be custody and visitation orders. There will be at some point a finding that he's the father, which frankly needs to happen so we get some documentation in some file, here, Iowa, somewhere." (Italics added.)
The court then turned to custody and visitation issues. After some discussion among the court, the attorneys, and the parties, the court ordered that S.M. and E.P. were to share custody of C.M. over the following week 50-50, such that S.M. would take C.M. the first night, and return him to E.P. the following day at noon. E.P. and S.M. were to exchange the child each day at noon.
At a later point in the hearing, the court said, "I want the two parents to exchange cell phone numbers. [¶] Now keep in mind the box will be checked *1264 on this restraining order, except for contact regarding child visitation. Use these phones judici[ously], please, not to call or text, just to chat. [Only when] there is something related to the child, that's it." E.P.'s attorney requested that the court "check" the box "that says [E.P.] can record the conversation[s]." The court responded, "Well, I'm not going to order that right now. If there is a problem, come back and I will give [it] serious consideration. [¶] I expect this now to quiet down, and let's be professional about this."

2. Applicable law

(2) Pursuant to the Domestic Violence Prevention Act (DVPA) (§ 6200 et seq.), a court may issue a protective order to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved. (§§ 6220, 6300.) Specifically, section 6300 provides, "An order may be issued under this part, with or without notice, to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if an affidavit or, if necessary, an affidavit and any additional information provided to the court pursuant to Section 6306, shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (Italics added.)
(3) The DVPA defines domestic violence as "abuse" perpetrated against enumerated individuals, including a former spouse or cohabitant. (§ 6211, subds. (a), (b).) "`[A]buse' means any of the following: [¶] (a) Intentionally or recklessly to cause or attempt to cause bodily injury[;] [¶] (b) Sexual assault[;] [¶] (c) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another[;] [¶] (d) To engage in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203.) The behaviors outlined in section 6320 include "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not limited to, annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members." (§ 6320, subd. (a).)
"A grant or denial of injunctive relief is generally reviewed for abuse of discretion. [Citation.] This standard applies to a grant or denial of a protective order under the DVPA. [Citation.]" (Gonzalez v. Munoz (2007) 156 Cal.App.4th 413, 420 [67 Cal.Rptr.3d 317].) However, "[j]udicial discretion to grant or deny an application for a protective order is not unfettered. The *1265 scope of discretion always resides in the particular law being applied by the court, i.e., in the `"legal principles governing the subject of [the] action ...."'" (Nakamura v. Parker (2007) 156 Cal.App.4th 327, 337 [67 Cal.Rptr.3d 286], citing City of Sacramento v. Drew (1989) 207 Cal.App.3d 1287, 1297 [255 Cal.Rptr. 704] and County of Yolo v. Garcia (1993) 20 Cal.App.4th 1771, 1778 [25 Cal.Rptr.2d 681] ["range of judicial discretion is determined by analogy to the rules contained in the general law and in the specific body or system of law in which the discretionary authority is granted"].)

3. Analysis

On appeal, S.M. contends that there was no showing that he engaged in domestic violence or abuse, within the meaning of section 6200 et seq., and that the court therefore abused its discretion in issuing a restraining order against him. E.P. argues that there was evidence of abuse. Specifically, E.P. contends that the conduct on S.M.'s part that constituted abuse "consisted of throwing the covers off of [E.P.] in the middle of the night and threatening to kill her," "refus[ing] to let [E.P.] leave the home with [C.M.]" and "ask[ing] to be arrested." E.P. claims that "these actions support [E.P.'s] statements that she was afraid of [S.M.]." Because E.P. has not identified any conduct that would constitute "an intentional or reckless act that causes or attempts to cause bodily injury" or "an act of sexual assault," we presume that she is asserting that S.M.'s conduct either placed her "in reasonable apprehension of imminent serious bodily injury to ... herself or to another" or involved behavior that may be enjoined under section 6320.
We conclude that neither the trial court's findings, nor the evidence in the record, establishes that S.M. engaged in conduct that placed E.P. in reasonable fear of serious bodily injury or that he engaged in a type of behavior identified in section 6320.
E.P. relies on S.M.'s alleged death threat in arguing that the evidence supported the trial court's issuing a restraining order. However, the trial court specifically declined to find that S.M. made a threat against E.P. as E.P. claimed, stating, "I'm not making a finding there was a death threat." E.P. essentially concedes that the alleged threat is necessary to support the court's issuance of the restraining order, arguing on appeal that, "[S.M.'s] described badgering combined with a threat is sufficient to issue a restraining order." (Italics added.) Because the court specifically did not find that S.M. had made a threat toward E.P., the only remaining conduct on S.M.'s part that could support the issuance of the restraining order is what the trial court referred to as "badgering." However, as E.P. appears to concede, without a finding that S.M. threatened E.P., the evidence of S.M.'s conduct," is legally insufficient, by itself, to support issuance of a restraining order in this case.
*1266 In examining the record supporting the trial court's finding that S.M. engaged in badgering, it is clear that the court was using this term to referring to S.M.'s conduct during the parties' argument. The court described S.M.'s behavior as involving, "a very negative comment, ... an argument, and essentially he wouldn't stop and was badgering her." The court went on to say, "Having witnessed this behavior in court, having seen the police report which basically substantiated the same kind of behavior, I'm satisfied he behaved that way."
The trial court's description of S.M.'s behavior does not support a finding that S.M. engaged in abuse. For example, the court stated that "[S.M.] was understandably agitated here in court at the early part of the proceeding." (Italics added.) The court went on to explain that its use of the word "agitated" was not meant to suggest that S.M. was "acting in a violent or rude manner," but, rather, that S.M.'s behavior demonstrated that he was "highly concerned about losing contact with [his] child," a concern that the court found to be "certainly commendable." The parties' testimony and the police reports demonstrate that S.M.'s badgering involved his refusal to give E.P. permission to take C.M. to Iowa without her signing a stipulation that she would return with the child, and/or his refusal to agree to let E.P. take C.M. out of the house that morning. Although S.M. may have been forceful in his refusal, the court made no finding that S.M. engaged in conduct that rose to the level of harassment or abuse, and the record does not reveal that any such conduct in fact occurred.[10] The trial court's issuance of a restraining order under these circumstances is not authorized under section 6300.
Further, the trial court did not find that E.P. was in "reasonable apprehension of imminent serious bodily injury." Rather, the court said, "I can also see how [S.M.'s conduct] might engender concern on someone else's part, who in her mind believes the relationship is over." "[C]oncern" is not equivalent to "reasonable apprehension of imminent serious bodily injury." Although the court noted that E.P. became "afraid," without a threat, S.M.'s pulling off E.P.'s covers and not giving E.P. permission to leave the house with their child cannot be considered to be conduct that would have placed E.P. "in reasonable apprehension of imminent serious bodily injury." (Italics added.)
The trial court's attempt to limit the legal effect of the restraining order further illustrates that the issuance of the order was an abuse of discretion. *1267 Specifically, the court's comments concerning the scope of the restraining order demonstrate that the court misunderstood the extent of the court's discretion in issuing the restraining order, and further suggest that the court did not believe that the facts of this case supported issuing a restraining order under section 6300. For example, in deciding to issue the restraining order, the court said, "Please understand I do not take in the facts of this case unless something else happens to change my mind, Mr. Mazzei, I don't view this as the kind of restraining order which would tell me pursuant to the Family Code that your client is inappropriate for custody or visitation. Obviously he's got a substantial custody order with three other children. Obviously he cares for this child. Obviously he's engaged in a profession which would suggest responsibility, but we can't have these histrionics. This whole thing needs to calm down." (Italics added.)
The Family Code provision to which the trial court was referring is section 3044. That section creates a presumption against awarding sole or joint physical custody to a party who the court has found "perpetuated domestic violence against the other party seeking custody of the child ... within the previous five years." (§ 3044, subd. (a).)[11]
(4) The trial court's remarks suggest that the court intended that it, or any court that would be making custody determinations in this case in the future, would not take into consideration the fact that the court had issued a restraining order against S.M. The trial court appears to have been under the misimpression that a court can "call... into play" the presumption contained in section 3044 only when the court believes it is appropriate. However, section 3044 does not authorize a court that is making a custody determination to ignore a prior finding that one parent has perpetrated domestic violence against the other parent. Rather, section 3044 imposes a rebuttable presumption against awarding sole or joint physical or legal custody "to the perpetrator [u]pon a finding by the court that a party seeking custody of a child has perpetrated domestic violence" against the other party seeking custody of the child, by operation of law.
Because a DVPA restraining order must be based on a finding that the party being restrained committed one or more acts of domestic abuse, a finding of domestic abuse sufficient to support a DVPA restraining order necessarily triggers the presumption in section 3044. By stating that, in its *1268 view, the presumption of section 3044 should not be imposed against S.M., the trial court suggested that the court was not making a finding of domestic violence sufficient to trigger the presumption. If the court did not intend to make a finding that S.M. had committed an act of domestic violence sufficient to trigger the presumption of section 3044, then the court could not have found that S.M. had engaged in domestic violence sufficient to support issuance of a restraining order under section 6300.
The court made additional comments that demonstrate that the court did not believe that S.M.'s conduct met the statutory definition of "domestic violence" or "abuse." For example, when asked by S.M.'s attorney to clarify whether the court's order "[was] that the Family Code section presumption against custody for one with the restraining order does not apply to this case," the court explained that it "c[ould] see how all this evolved. But if there are more incidents of this sort of behavior, [the court] may call the presumption into play." Implicit in this statement is the court's view that S.M. would have to engage in some additional behavior before the court would find that he engaged in domestic violence, and that without some abusive behavior on S.M.'s part in the future, the court felt that the presumption of section 3044 should not apply to him.
It appears that the trial court was attempting to create its own version of a restraining order that did not require a finding of abuse as a prerequisite, and that would not trigger the presumption against sole or joint custody. However, the trial court apparently failed to recognize that issuing a restraining order under section 6300 would necessarily trigger the presumption contained in section 3044. Given this record, we are not convinced that the trial court would have issued the restraining order if the court had understood that it did not have the authority to nullify the presumption in section 3044 once a restraining order was issued. In issuing a restraining order while at the same time attempting to limit the legal effect of that order, the court abused its discretion under the DVPA.
(5) We conclude that the trial court was under a misimpression as to its authority to limit the legal effect of the restraining order that it issued. In view of the lack of any finding that S.M. engaged in conduct that constitutes domestic abuse within the meaning of section 6200 et seq., and because the record established that the trial court misunderstood the legal effect of its restraining order, we conclude that the court abused its discretion in issuing the order and reverse the May 4, 2009 restraining order against S.M.

*1269 IV.

DISPOSITION
The trial court's May 4, 2009 restraining order is reversed. S.M.'s appeal from the trial court's May 5, 2009 minute order is dismissed as moot. The parties are to bear their own costs on appeal.
McDonald, Acting P. J., and Irion, J., concurred.
NOTES
[1] In early 2009, the parties executed a "Voluntary Paternity Affidavit," filed with the Iowa Department of Public Health, in which both parties acknowledged that S.M. is C.M.'s biological father. Thereafter, Iowa issued an updated birth certificate that identified S.M. as C.M.'s father. As a result, parentage was not at issue in the custody and support action E.P. filed in Iowa.
[2] Further statutory references are to the Family Code unless otherwise indicated.
[3] This document does not appear to have been filed with a court in Iowa. Rather, it appears to be part of E.P.'s request for child support made through the Iowa Department of Human Services.
[4] S.M. has physical custody of his three children 50 percent of the time
[5] According to S.M., he dismissed the earlier paternity action when E.P. moved to Iowa to give birth to C.M., because he was under the impression that E.P. intended to stay in Iowa after C.M.'s birth.
[6] A defense attorney whom S.M. retained to represent him after his arrest informed S.M. that he had contacted both the district attorney's office and the city attorney's office and had been told that no charges would be filed against S.M. There is no evidence in the record that S.M. was ever charged in the matter.
[7] S.M. included in his supplemental brief a request for judicial notice of Iowa Code sections 236.2, 598.41, and 600B.40. This court notified counsel for S.M. that the court would disregard S.M.'s request for judicial notice because the request was improperly included in the brief. (See Cal. Rules of Court, rule 8.252(a)(1).) Two days later, S.M. filed a separate request for judicial notice of the same materials. We notified the parties that the court would consider S.M.'s request for judicial notice concurrently with the appeal.

We now deny S.M.'s request for judicial notice. The Iowa statutes are irrelevant to our determination of S.M.'s appeal from the restraining order against him.
[8] A California court may take judicial notice of the contents of the decree of the Iowa District Court pursuant to Evidence Code section 452, subdivision (c) (official acts of the judicial departments of any state) and/or subdivision (d) (records of a court of record of any state). Evidence Code section 459 permits reviewing courts to take judicial notice "of any matter specified in Section 452." S.M. does not object to this court taking judicial notice of the contents of decree from the Iowa District Court, and, in fact, "agrees that the issue of jurisdiction may be dismissed pursuant to the Iowa Decree."
[9] It appears that the parties never considered the effect of their stipulated agreement to the Iowa court's jurisdiction on S.M.'s appeal of the trial court's order restraining him from contacting E.P.
[10] For example, E.P.'s description of S.M.'s conduct that night, absent her allegation of the threat, is as follows: "I felt like I could not move out of the room because I asked him to [leave the room], and then he continued to ask me to leave the room and leave his house. [¶] ... [¶] Then I had to call the police because he wouldn't leave me alone. He continued to sit on the bed. And I tried to pull the covers back to go back to sleep, and he would not allow me to have the covers. So I phoned the police. And at that point he phoned his sister to get her on the phone because he said he wanted to have her as a witness when the police were there."
[11] Subdivision (a) of section 3044 provides: "Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence against the other party seeking custody of the child or against the child or the child's siblings within the previous five years, there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child, pursuant to Section 3011. This presumption may only be rebutted by a preponderance of the evidence."