Filed 5/22/23 H.B. v. F.K. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| H.B.,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>F.K.,<br><br>    Defendant and Appellant. | B322100<br><br>(Los Angeles County<br>Super. Ct. No.<br>22LBFL00156) |

APPEAL from an order of the Superior Court of Los Angeles County, Esther P. Kim, Judge. Reversed.

Galperin & Hensley and Yury Galperin for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

H.B. obtained a domestic violence restraining order (DVRO) against her estranged husband, appellant F.K., pursuant to the Domestic Violence Prevention Act (DVPA). (Fam. Code, § 6200 et seq.)[1]  The trial court issued the DVRO on the grounds that appellant "called the mother of his children 'fat,' 'lazy,' 'trailer trash.' "

The trial court misinterpreted the purpose and scope of the DVPA, which "prevent[s] acts of domestic violence, abuse, and sexual abuse." (§ 6220.)  Puerile name-calling by a spouse is lamentable but does not warrant a DVRO.  We reverse.

## FACTS AND PROCEDURAL HISTORY

The parties married in 2009.  Their sons, Lu. and Le., were born in 2017 and 2020.  In February 2022, H.B. separated from appellant and petitioned for dissolution of marriage.

H.B. requested sole custody of the children.  She wrote that appellant "can be emotionally abusive with the children and has not spent any quality time alone with them."  They are not bonded and four-year-old Lu. fears appellant, who lashes out and is "capricious."  H.B. wrote that appellant "inappropriately exposed himself to the children while masturbating" in December 2021.  H.B. claimed to have video of this lewd act.

In a DVRO request, H.B. wrote that appellant threatens to not pay bills and "emotionally abuses [her] and the children daily . . . [She] is fearful he may harm [the] children and herself."  She alleged that appellant "fondles himself daily and in front of the

---

[1] Undesignated statutory references are to the Family Code.  We use initials to identify family members.  (Cal. Rules of Court, rule 8.90(b)(1) & (11).)  H.B. has not filed a brief in this appeal.

2

children" and "walks around the house without underwear and [the] children [have] reacted to seeing his genitals."

Appellant opposed a DVRO and sought joint custody. He declared, "All of the allegations made against me by [H.B.] are false. They are an attempt to gain our children's sole custody." Both parents are "completely involved in our children's lives" and H.B. "never had any complaints about my parenting." Appellant disagreed with any restrictions on contact. He pays all bills and sends H.B. $2,000 per month. In New York, appellant earned $250,000 annually, but when he moved to Los Angeles to be near the children his income fell to $80,000.

In a supplemental declaration, H.B. faulted an investigation by the Los Angeles County Department of Children and Family Services (DCFS), noting that parental nudity around children is not the same as "sexual" behavior in front of them. H.B. declared that appellant engaged in verbal abuse. "It would start with a little insult and spiral into an hour(s) of ranting." He follows her if she walks away, continuing to rant. He "called me fat, and trailer trash, . . . you will die from cancer, etc."

Appellant responded that DCFS deemed H.B.'s allegations of abuse unfounded. All her allegations "are false," she "is not credible" and has not presented admissible evidence. She interacts with their children while naked. Appellant requested primary custody.

### The Hearing

The court took evidence on the DVRO request at a hearing on May 17, 2022. Counsel advised the court that DCFS deemed H.B.'s claims to be "unfounded." The court said the DCFS determination would weigh into its decision.

3

H.B. testified that appellant exercises financial control over her. He threatens to quit his job so "there would be no money." He gives her cash for food, clothing, household supplies and the children. H.B. earns a yearly average of $12,000 as a photographer, which supplements the money from appellant. He does not have access to her income.

To diminish H.B., appellant told her she is "fat," had "trailer trash friends," and would get cancer, knowing her mother died of cancer. H.B. stayed quiet to avoid further provocation. The court heard recordings H.B. made of appellant's remarks but did not hear anything relevant and did not admit them.

Appellant is "angry a lot and yells in the home a lot." He leaves things in disorder, then yells at H.B. when he cannot find them. Lu. expressed fear of appellant, tells him to stop yelling and tries to protect H.B. H.B. recalled that appellant yelled at her about a missing piece of mail the day she came home from the hospital with newborn Lu.

H.B. testified that she and appellant practice nudity at home because "it's okay for [the children] to see our bodies." After a "heated argument" one day, she tried to "bring happy feelings back in" with a dance party. Later, she realized that she had filmed appellant masturbating in the background. The boys did not say anything. In response to the court's questions, H.B. said, "I don't know" if they saw their father's conduct.

H.B. agreed that seeing their father nude is not new or shocking to the children, and their attention was focused on the television. She asked appellant to cover himself. When she saw he was stoking himself, she told him to leave the room and he said "no." This was the first time he engaged in this behavior and she was shocked. H.B. believes appellant was still angry

from their argument and took things "to another level of not just fondling and playing with everything to actually, like stroking himself."

H.B. told the court that appellant often touches his genitals, sometimes in his underwear or while wearing pants. When she questions him, he says he is "just readjusting" himself. The children "react to him touching his genitals." She maintains that appellant "fondle[s] himself daily in front of the children" or at least had his hand on his genitals. The children emulated his behavior but stopped once they were no longer living with him. H.B. frequently asked appellant not to touch his genitals, so the boys would not think it was normal to do so "outside of a private space."

The court admitted into evidence a video taken by H.B. It described appellant sitting on the couch, naked, while Le. dances in a circle. Appellant told the court, "I was not masturbating. I did not have an erection. I was looking at my phone."

H.B. testified that when the family lived together, Le. "vomit[ed] daily" from anxiety and cried often. Once she left appellant and returned to California, Le. stopped vomiting. She said appellant "never put his hands on me," but often blocked her from leaving a room, making her feel "scared and trapped." She feared it would escalate to a physical attack because he was increasingly angry.

In his testimony, appellant conceded that "we've had arguments" and he was, at times, disrespectful. He regrets calling H.B. "fat" and "a lazy ass." He denied physical altercations or blocking. H.B. sometimes lifted him from the floor because she is taller, which was degrading. He did not believe he called her names in front of the children, saying, "I make it a

5

point to praise their mother in front of them." However, the court did not believe appellant because there was a "prolonged pause" before he answered its questions about calling her names in the presence of the children.

The court was concerned by appellant's "degrading" language but not his behavior with his genitals because it seemed that the children did not see any masturbation. The problem was that appellant made H.B. "feel worthless" by engaging in verbal abuse. Appellant said that H.B. calls him names—"asshole," "dick," "bipolar," and "narcissist"—and told him to "shut up."

## The Court's Ruling

The court found that H.B. did not meet her burden of showing sexual misconduct, which is bolstered by DCFS's determination that the claim was unfounded. Nudity is common in the household. "The court does find that there has been, unfortunately, harassment in this matter, and it is based on [appellant's] own admission that he has called the mother of his children 'fat,' 'lazy,' 'trailer trash.' " The court acknowledged that the insults might run in both directions. It observed that children listen to everything their parents say and may repeat the insults to their mother, to future partners, or at school.

The court granted a one-year DVRO as to appellant's "personal conduct," meaning "you are not to degrade" or abuse, i.e., harass, attack, strike, threaten, assault, hit, follow, stalk, molest, destroy personal property, keep under surveillance, impersonate, block movement, annoy by phone or other electronic means or disturb H.B.'s peace. The court did not grant a stay-away order because "the crux of this case is the personal conduct." He is not allowed to enter her residence. Appellant

6

was ordered to take a 52-week batterer's intervention program. He may visit the children without supervision.

## DISCUSSION

### 1. Appeal and Review

An order granting an injunction is appealable. (Code Civ. Proc., § 904.1, subd. (a)(6).) A DVRO "is a type of injunction, as it is an 'order requiring a person to refrain from a particular act.' " (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1503–1504.) The DVRO is appealable. (*Id.* at p. 1502, fn. 9; *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1257–1258 (*S.M.*).)

We review a DVRO for abuse of discretion. " '[J]udicial discretion to grant or deny an application for a protective order is not unfettered. The scope of discretion always resides in the particular law being applied by the court, i.e., in the " 'legal principles governing the subject of [the] action.' " ' " (*S.M., supra,* 184 Cal.App.4th at pp. 1264–1265; *In re Marriage of Everard* (2020) 47 Cal.App.5th 109, 123.)

" '[T]he question of "whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review." ' " (*Ashby v. Ashby* (2021) 68 Cal.App.5th 491, 509.) We defer to the court's factual and credibility findings. (*People v. Stanley* (2006) 39 Cal.4th 913, 951; *In re Marriage of Ananeh-Firempong* (1990) 219 Cal.App.3d 272, 278; *In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.)

### 2. Due Process Violation

Appellant contends that his due process rights were infringed because he had no advance notice that the court would grant the DVRO on the grounds "that [he] called [H.B.] 'fat,' 'lazy,' and 'trailer trash.' " Appellant forfeited this claim by

7

failing to object to H.B.'s testimony at the hearing. (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 227.)

Appellant asserts that H.B. never alleged in writing that he called her names. He is mistaken. In a supplemental declaration, H.B. averred that appellant "called me fat, and trailer trash." Four hours later, appellant responded with his own supplemental declaration. At the hearing, he testified that he called H.B. "fat" and a "lazy ass." Appellant had advance notice of H.B.'s claim *and* an opportunity to respond to it in writing and at the hearing. There is no due process violation.

### 3. Scope of the DVPA

The purpose of the DVPA "is to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.) The DVPA is broadly construed to accomplish its purpose. (*N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 602 (*N.T.*).)

A DVRO may issue if an affidavit or testimony "shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (Fam. Code, § 6300.) Abuse includes bodily injury, sexual assault, or causing "reasonable apprehension of imminent serious bodily injury." (Fam. Code, § 6203, subd. (a)(1)–(3).) It "is not limited to the actual infliction of physical injury or assault." (*Id.*, subd. (b).) Violation of a DVRO is punishable as a misdemeanor. (Pen. Code, §§ 166, subd. (c)(3)(A), 273.6.)

A court may enjoin "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering," false impersonation, harassing, annoying telephone calls, destroying personal property, contacting, approaching, and disturbing the

8

peace of the other party. (§ 6320, subd. (a).) Disturbing the peace is conduct that "destroys the mental or emotional calm of the other party." (*Id.*, subd. (c).) It includes "coercive control" that "unreasonably interferes with a person's free will and personal liberty" such as isolating the person; withholding basic necessities; controlling or monitoring movements, behavior, communications, finances, resources or access to services; or compelling conduct by force or intimidation. (*Ibid.*)

### 4. Case Law Interpretations of the DVPA

Courts have acknowledged that the DVPA may apply without infliction of physical injury or assault. (*N.T., supra,* 34 Cal.App.5th at p. 602.) In *N.T.*, a husband was subject to a temporary restraining order forbidding him from harassing, stalking, or contacting his wife, or disturbing her peace: While the TRO was in effect, he tried to discuss their relationship; refused to relinquish their child after visits; sought physical intimacy; followed her; placed a letter to her in a diaper bag; and came to her confidential location despite being prohibited from obtaining her address. (*Id.* at pp. 598–601.) The appellate court wrote that these actions "would have been acts of abuse without the existence of the TRO" because they are "obvious breaches" of the wife's peace. (*Id.* at p. 603.)

A DVRO is warranted if a spouse publicly discloses confidential e-mails to control, harass and abuse the petitioner by damaging her business and personal relationships, which "destroys the mental or emotional calm of the other party." (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497–1499; *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416 [DVRO issued to stop use and disclosure of private text and e-mail messages].) After a relationship ends, subjecting someone

9

to ongoing electronic and personal contact, despite requests to stop, is a disturbance of her peace.  (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1142–1143, 1146–1147.)

A DVRO may issue where a petitioner shows a course of misconduct (instances of physical violence and emotional abuse) and testifies that her male partner is "an aggressive person capable of violence."  (*Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 397–398.)  In *Perez,* a partner texted and called the petitioner "hundreds of times," said she was "going [to] pay" and broke into her home, causing her to fear for her safety and that of her children.  (*Id.* at pp. 392, 395.)

By contrast, calling someone names—when there is no history of physical abuse, threats of harm or ongoing harassment—does not justify a DVRO.  A DVRO is unsuitable for a former partner who called the petitioner a " 'cold bitch' " and " 'spoiled brat,' " where the trial court found he was excitable, frantic or agitated and needed "to calm down" but found that no threats were made.  (*S.M., supra,* 184 Cal.App.4th at pp. 1258, 1262–1263.)  The trial court described the behavior as involving " 'a very negative comment, . . . an argument, and essentially he wouldn't stop and was badgering her.' " (*Id.* at p. 1266.)  The appellate court concluded that this was *not* abuse.  (*Ibid.*)

### 5.  The DVPA Does Not Apply Here

The record does not show bodily harm, sexual assault or apprehension of imminent serious bodily injury.  (§ 6203, subd. (a).)  Nor does it contain evidence that appellant molested, attacked, struck, stalked, or threatened H.B. or disturbed her peace.  (§ 6320, subd. (a).)  The trial court believed appellant's testimony that he did not engage in lewd behavior or cause H.B. fear by blocking her movements.  We defer to the court's

10

credibility assessment of the witnesses.  H.B. conceded that appellant "never put his hands on me."  The court did not find that appellant engaged in financial abuse or coercion.

The sole basis for the DVRO was the court's finding of "harassment in this matter, and that is based on [appellant's] own admission that he has called the mother of his children 'fat,' 'lazy,' 'trailer trash.' "

The DVPA addresses abuse, not rudeness.  Appellant's name-calling was ill-mannered or mean but did not amount to abuse under the DVPA.  As in *S.M., supra,* 184 Cal.App.4th at page 1266, no abuse is shown by " 'a very negative comment' " during an argument or " 'badgering.' "  If intemperate words between spouses and partners were grounds for a DVRO, the courts would be overcome by litigants seeking to control uncouth language or judicially suppress opinions that a spouse is, perhaps, overweight or could do a better job of house cleaning.  This is untenable.

H.B. did not show a course of misconduct—including a history of physical violence—or an onslaught of hundreds of harassing calls and texts that caused extreme fear.  (*Perez v. Torres-Hernandez, supra,* 1 Cal.App.5th at p. 398 ["[t]he phone calls and texts harassed Perez"].)  Nor did H.B. present evidence that appellant waged an "e-mail campaign" to friends and employers or made "alarming, annoying and harassing" sexual accusations about her to her children, causing so much emotional distress that one child required care at a mental health facility.  (*Altafulla v. Ervin* (2015) 238 Cal.App.4th 571, 574.)

Neither the plain language of the DVPA nor the case law interpreting it support the issuance of a DVRO.  The court elevated a garden-variety spat and hurt feelings into a case of

domestic violence and abuse exceeding the scope of the DVPA. Case law shows that a DVRO requires more than name-calling: The cases show outrageous harassment—sending hundreds of unwanted and threatening messages or disclosing private matters for no legitimate purpose—sometimes preceded by violent conduct. No evidence of outrageous behavior was presented here. The court abused its discretion by issuing a DVRO because appellant called H.B. "fat," "lazy" or "trash." The conduct does not fall within the DVPA. (*S.M., supra,* 184 Cal.App.4th at pp. 1264–1265.)

### 6. The Court May Consider Alternatives to a DVRO

Although a DVRO is unwarranted for mere name-calling, the court has at its disposal means to ensure that the children are not exposed to bad behavior, which was the court's primary concern. "It is certainly in the best interests of any children of divorce that the adults in their lives act in a mature and courteous manner." (*In re Marriage of Candiotti* (1995) 34 Cal.App.4th 718, 725–726 [former spouse has a First Amendment right to disparage her children's stepmother to other adults, if it does not directly affect the children].)

"In family law cases, courts have the power to restrict speech to promote the welfare of the children. Thus courts routinely order the parties not to make disparaging comments about the other parent to their children or in their children's presence." (*In re Marriage of Hartmann* (2010) 185 Cal.App.4th 1247, 1251; *Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824, 833 [the court may prevent spouses from disparaging each other in front of the children but prohibiting a spouse from posting about the divorce on-line is an unconstitutional prior restraint].) In this instance, the court may order the parties to refrain from

12

disparagement or name-calling in the presence of their children, without the need for a DVRO.

## DISPOSITION

The order entered May 17, 2022, is reversed. The parties must bear their own costs on appeal.

NOT TO BE PUBLISHED.


KWAN, J.*

We concur:


CHAVEZ, Acting P. J.


HOFFSTADT, J.

---

**\*** Judge of the Superior Court of Los Angeles County assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.