Filed 5/17/22  A.C. v. M.N. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| A.C.,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>M.N.,<br><br>        Defendant and Appellant. | A162999<br><br>(San Mateo County<br>Super. Ct. No. 20-FAM-00646-A) |

This appeal involves a husband and wife who each sought a domestic violence restraining order (DVRO) against the other under the Domestic Violence Protection Act (Fam. Code, § 6200 et seq).  After a lengthy evidentiary hearing, the trial court denied the husband's request, granted the wife's request for a no-harassment order, and ordered joint legal and physical custody of the couple's children with an equal timeshare.  The husband, M.N., now appeals, but because he fails to show that the trial court abused its discretion in making these orders, we will affirm.

1

# FACTUAL AND PROCEDURAL BACKGROUND

Appellant M.N. (Husband) and respondent A.C. (Wife) met in 2011 and married in 2014. In April 2020, when their children were ages 2 and 4, they filed their competing requests for protective orders.[1]

A. *Requests for Protective Orders*

On April 13, Husband filed a request for DVRO against Wife, alleging that Wife had physically abused him, that he felt unsafe living with her, and that she emotionally and verbally abused him. Husband alleged two incidents of abuse. The first was sometime between January 23 and 28, when Wife kneed him in the groin and slapped him in the face after he asked her to stop having relationships with other men and they fought over access to their cell phones (the January incident). The second was on April 9, when Wife accessed Husband's electronic devices and accounts without his permission in an unsuccessful attempt to delete recordings of the two of them discussing the January incident.[2] Husband sought a stay-away order, a move-out order, and sole physical custody of the children with no visitation for Wife. On April 14, Husband's requests were temporarily granted until a hearing set for May.

Also on April 14, Wife filed her own request for DVRO, alleging that on an ongoing basis Husband pressured and harassed her to perform or agree to perform sexual activities, and had threatened to take the children away from her if she would not agree to his sexual demands. Wife explained that when

---

[1] Subsequent dates are in 2020 unless otherwise stated. All statutory references are to the Family Code.

[2] Husband stated in his petition that he called the police at about 4:00 a.m. on April 10 to report the January incident and that after he made the call, he learned of Wife's attempt to delete the recordings.

2

the couple married, they had an understanding that she would have sex with him every day, whether or not she wanted to have sex on any particular day. She could ask for permission to skip a day, in which case she must "make it up" by having sex twice on a future day, but, she alleged, Husband claimed he could deny a request for a future date. The parties referred to this arrangement as their "marriage contract," and the "make it up" rule as a "double tap." Recently the couple had conflicts in which Husband had harassed her: if she refused to have sex and did not want to make it up later, Husband would argue with her late into the night and keep her awake until she agreed to have sex or "double tap." Wife alleged three incidents of abuse.

First, on March 25, after an argument about sex, Wife said she would be skipping sex that day. Early in the morning of March 26, Husband complained that her refusal was an "abusive violation" of the marriage, and that she needed to leave the apartment. When she refused, he threatened to leave with the children. Later that day, a friend invited Wife to stay with her for a few days. Husband told Wife that if she went, he would separate from her and might not welcome her back afterwards unless she assured him that she would stay married to him. He eventually agreed she could go after having sex with him three times. She agreed at first, but ultimately did not follow through and did not visit her friend.

Second, Husband and Wife argued from about 10:00 p.m. on March 27 to 3:00 a.m. on March 28 because Wife did not want to have sex or agree to make it up. Husband said that if she insisted on that, he would take the children away to San Diego. After a long argument, Wife told Husband she was going to sleep, but he would not let her: he pulled the blankets off her, opened the door to let cold air in, turned off the heater, and turned on the lights. When she put on warm clothing and earplugs, Husband began getting

dressed as if he were leaving. Fearing that he would take the children from the home, Wife agreed to make up the sex so that he would let her sleep and not take the children.

Third, on April 9, Husband and Wife had another argument about sex. Wife said she would not have sex or agree to make it up later. Husband argued with Wife about the issue for a while, and then said he would divorce her. When she still would not agree to have sex, he expressed plans to move forward in divorcing, and since then had complained multiple times a day that she is depriving him of sex and using sex sadistically to get her way in arguments. He told her that if she wants to stay married but is not willing to live up to the sexual agreement, she could enter a new agreement to have as many children as he wants. She refused and said she wanted to stay married and work things out without the sexual agreement.

Wife included in her petition additional allegations to provide "context" for the "escalation" of Husband's harassment in recent months. She alleged that she and Husband had agreed in November 2019 to open the marriage to other sexual partners. Since then, both had partners outside the marriage. On January 23, Husband tried to cut off Wife's contacts with others by engaging in a tug-of-war with her over her phone. After that, Husband continued his relationships, but monitored Wife's text messages and phone calls and asked her to cut off her relationships. Husband threatened to take the children away from her if she did not agree to cut off her romantic contacts, while he maintained his.

On April 10, Wife called the police to report Husband's threats of leaving with the children.

Wife requested a no-harassment order, and requested that the couple share physical and legal custody, with Husband having visitation two days

4

per week. Wife's requests were temporarily granted on April 15, and were set to be heard with Husband's.

After continuances and extensions of the temporary orders, evidentiary hearings on Husband's and Wife's requests were held over two days in October. At the time of the hearing, Husband and Wife had joint custody of the children with an equal time share, pursuant to an order that had been entered in June.

B.    *Evidentiary Hearing*

At the evidentiary hearing, Husband and Wife were represented by counsel. By the time of the hearing, Wife had filed a petition for dissolution of the marriage. The court heard testimony from Husband, Wife, and a former nanny who had lived with the couple for about two years from 2016 to 2018. Several exhibits were admitted into evidence, including a social media post in which Wife sought support as a victim of "gas lighting" and abuse (but did not identify her alleged abuser), and a later social media post by Husband containing details about Wife's sexual history, which Wife testified was "horrible, public humiliation."

The evidence also included an audio recording of a March 29 discussion between Husband and Wife and a transcript of the recording. In the recording, the parties discussed their different perspectives on incidents that were alleged in their respective petitions (which were filed after the recording was made), including the January incident in which Wife struck Husband and the March incident in which Husband threatened to take the children to San Diego. During the discussion, Wife commented, "[Y]ou're using this recording and if I ever do want to divorce you, you're probably just going to use it against me in child custody proceedings." Toward the end of the discussion, Wife said she did not consent to the discussion being recorded.

5

Husband said, "I had consent going into this." Wife responded, "You don't anymore." Shortly thereafter, the recording ended.

C.    *Trial Court Ruling and Appeal*

The trial court announced its decisions after hearing extensive argument from counsel.

The court denied Husband's request for a restraining order against Wife. The court stated it found Wife's testimony credible. Wife admitted kneeing Husband in the groin and slapping him in January, but the court found extenuating circumstances such that the incident did not constitute domestic violence. There were already difficulties in the marriage, and there were specific "events that triggered [Wife's] actions" that day, which the court found to be "aberrant and out of line with her normal behavior" and would not be repeated. After the incident, Wife "immediately retreated and she was apologetic." The court found no other violent acts by Wife.

The court denied Husband's request for full custody of the children. The court found that in view of the circumstances leading up to Wife's kneeing and slapping Husband, the January incident did not constitute domestic violence for purposes of triggering the rebuttable presumption under section 3044, subdivision (a), that an award of sole or joint custody to Wife was detrimental to the children's best interest.[3] The court concluded from the evidence that both Husband and Wife loved their children and

---

[3] Section 3044, subdivision (a) provides: "Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence within the previous five years against the other party seeking custody of the child . . . there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child . . . . This presumption may only be rebutted by a preponderance of the evidence."

6

wanted to be responsible parents, and that it was in the children's best interest to retain the then-existing arrangement of joint custody with an equal timeshare.

The court granted Wife's request for a no-harassment order against husband, explaining that it found evidence of a pattern of intimidation and harassment in the marriage sufficient to leave the temporary order in place, but for three years rather than the requested five years. The court found evidence of harassment in Husband's enforcement of the parties' agreement to have sex every day; his responses when he was denied sex, such as pulling the blankets off Wife or repeated incidents of badgering her for hours to prevent her from sleeping; his use of the audio recording not just to preserve evidence but also as a way to exert leverage to keep Wife in the marriage and hold her to their agreement to have sex every day; and his contacting the police and seeking a restraining order and full custody of the children after the parties discussed divorce. The court noted that while the temporary no-harassment order was in place, Husband had humiliated Wife by "taking the marriage's dirty laundry and airing it on" social media in a post that described Wife in a shaming way as agreeing to polyamorous relationships. The court expressed concern that husband would continue to post things about the marriage on social media that could be seen as humiliating and would be harassing to Wife.[4]

Accordingly, the trial court extended the no-harassment order against Husband, setting an expiration date in October 2023.[5] The court also ordered

---

[4] The court stated that it was respectful of Husband's First Amendment rights, and that Husband was "allowed to vent his feelings and post whatever he wants as long as it's not harassing."

[5] The court's orders were filed on Judicial Council Form DV-130, "Restraining Order After Hearing (Order of Protection)." The no-harassment

joint legal and physical custody of the children with an equal timeshare, and ordered the parties to bear their own fees and costs. A written order was filed in January 2021, and this appeal timely followed.

## DISCUSSION

A.   *Principles of Appellate Review*

An order challenged on appeal is presumed to be correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) It is the appellant's burden to affirmatively demonstrate error. (*Ibid.*) Claims of error must be supported by reasoned argument and legal authority, or we may treat those claims as forfeited. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) Even if an appellant can show error, we will not reverse a trial court order unless the appellant shows prejudice from the error, which requires the appellant to show that it is " 'reasonably probable that, absent the error, the appellant would have obtained a more favorable result.' " (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 823.) The rules of appellate review apply when parties represent themselves on appeal, as they do in this case, as well as when they are represented by counsel. (See *Stokes v. Henson* (1990) 217 Cal.App.3d 187, 198 [self-represented party is entitled to the same consideration as other litigants and attorneys, but not to anything more].)

B.   *Applicable Law and Standard of Review*

The purpose of the Domestic Violence Prevention Act (DVPA) is "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period

---

order is a personal conduct order that Husband must not do the following things to Wife: "Harass, attack, strike, threaten, assault *(sexually or otherwise)*, hit, follow, stalk, molest, destroy personal property, disturb the peace, keep under surveillance, impersonate *(on the Internet, electronically or otherwise)*, or block movements."

sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.) The DVPA authorizes the trial court to issue an order "to restrain any person for the purpose specified in Section 6220 if [evidence] shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (§ 6300, subd. (a).) The trial court is to "consider the totality of the circumstances in determining whether to grant or deny" a request for a DVRO. (§ 6301, subd. (c).)

The DVPA defines "domestic violence" as "abuse perpetrated against" certain individuals, including a spouse or former spouse. (§ 6211, subd. (a).) "Abuse" is defined as "(1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a).)

Among the behavior that may be enjoined under section 6320 is "harassing, . . . or disturbing the peace of the other party." (§ 6320, subd. (a).) "[D]isturbing the peace of the other party" in this context has for more than a decade been interpreted to mean "conduct that destroys the mental or emotional calm of the other party." (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497 (*Nadkarni*).) In *Nadkarni*, the Court of Appeal concluded that a former wife made a sufficient showing of abuse under the DVPA by alleging that her former husband had destroyed her mental or emotional calm by "accessing, reading and publicly disclosing the content of [her] confidential e-mails."[6] (*Id.* at pp. 1498-1499.) "Abuse is not limited to the actual infliction of physical injury or assault." (§ 6203, subd. (b).)

---

[6] At the time *Nadkarni* was decided, and at the time the case before us was heard in the trial court, the phrase "disturbing the peace of the other

9

After notice and a hearing (§ 6340), a court is authorized to issue a protective order under the DVPA (§ 6218) with a duration of up to five years. (§ 6345.)

We review the trial court's decision to grant or deny a protective order under the DVPA for abuse of discretion. (*S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1264 (*S.M.*).) We review the trial court's conclusions of law de novo and its findings of fact for substantial evidence. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.) The trial court's "application of the law to the facts is reversible only if arbitrary and capricious." (*Id.* at p. 712.) As our Supreme Court has explained, "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

In applying the substantial evidence standard, we determine " ' " 'whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted,' supporting the trial court's finding. [Citation.] 'We must accept as true all evidence . . . tending to establish the correctness of the trial court's findings . . ., resolving every conflict in favor of the judgment.' " [Citation.]' " (*In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1424.) This means we do not reweigh the evidence or consider whether there might be substantial evidence to support a finding different from the trial court's, but only whether there is substantial evidence to support the findings that were made. (*Schmidt v. Superior Court* (2020) 44

party" was not defined in the DVPA. (*Nadkarni, supra*, 173 Cal.App.4th at p. 1497.) Effective January 1, 2021, the phrase is defined as "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (§ 6320, subd. (c), added by Stats. 2020, ch. 248, § 2.)

Cal.App.5th 570, 581-582 (*Schmidt*).)  We defer to the trial court's credibility determinations.  (*In re Marriage of Martindale & Ochoa* (2018) 30 Cal.App.5th 54, 61.)  The testimony of a single witness, including a party, may constitute substantial evidence.  (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

C.    *Analysis*

1.    *Denial of Husband's Request for a Restraining Order*

Husband argues that the trial court erred as a matter of law by declining his request for a restraining order after finding that Wife had kneed him in the groin and slapped him.  He also argues that substantial evidence shows that the trial court erred in finding that, apart from the kneeing and slapping, there was no evidence of other acts of violence by Wife.  He contends that the trial court was required not only to issue a restraining order against Wife but also to find that Wife had perpetrated domestic violence against Husband and to apply the rebuttable presumption of section 3044, subdivision (a), that awarding joint custody to Wife was detrimental to the best interest of the children.

"[A] finding of abuse is not mandated merely because the complainant shows he or she suffered an injury caused by the other party." (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 775 [affirming trial court order denying a request for DVRO].)  A person who, in view of all the circumstances, uses reasonably necessary force in responding to an aggressor does not commit abuse within the meaning of section 6203. (*Id.*at pp. 776, 779-780.)

Here, there is substantial evidence to support a finding that Wife used reasonably necessary force against Husband, under the totality of the circumstances, and thus that the trial court did not abuse its discretion in

11

declining to find that Wife perpetrated abuse and declining to issue a restraining order against her.[7] Wife testified that when she kneed and slapped Husband she and Husband had been engaged in a physical tug-of-war for possession of her phone. She felt "cornered and scared" and "desperate." Husband had instigated an argument about the status of their open marriage: he wanted her to cancel dates that she had made, apparently because he was jealous that she had more extramarital dates than he did. He said he was going to text the other men, and she asked him not to. He said he was going to do it anyway, and when he grabbed his phone to contact the other men, she grabbed it from his hands, and in frustration she tried to make it appear that she was breaking it, and then dropped it on the bed next to her. Husband then moved toward Wife's phone. She was scared of what he would do with it, scrambled over the bed and they both grabbed her phone at the same time. Wife testified that it was 3:00 a.m., and "I was cornered between the wall and the back wall and the bed and a man who had been yelling at me for five hours past my bedtime . . . and we were in a tug of war over my phone and I asked him to let go and he said, 'No,' and gave me his very aggressive look." Wife wanted to leave the room with her phone, but Husband was preventing her from leaving. She testified that at the time, she was scared of him, scared of social isolation, and scared about what messages Husband would send from her phone. She kneed him in the groin and

---

[7] Husband contends that because Wife stated in the parties' recorded discussion that she was not justified in kneeing and slapping him, the trial court erred in finding "extenuating circumstances" such that Wife's conduct did not constitute domestic violence. Husband is mistaken. The court reached its own conclusion as to whether Wife's conduct was justified under all the circumstances, in view of all the evidence before it, including the statements by both parties in the recorded discussion as well as the parties' testimony.

slapped him in quick succession and he let go of the phone. He left the room, and she went after him, apologizing. She testified, "I was in shock and I felt awful and I had not intended on doing that. It was an instinctual reaction, but I had never done that before and I felt bad." She explained, "Sometimes you do things in what feels like self-defense and you still feel badly for that." Asked whether she felt she was justified in hitting him, Wife responded, "In retrospect, I wish I had not, but at the same time I understand why I did, because I was scared and there was a person in a tug of war with me in a room while I was trapped after being yelled at for hours."

Husband argues that there was substantial evidence that Wife engaged in "a pattern of repeating abusive behavior," contrary to the trial court's statement that it had "heard no evidence of any other acts of violence." Husband points to evidence that Wife tried to delete recordings of her discussions with Husband; that she tried to destroy Husband's phone during the January incident; and that he was afraid of her. Husband also argues briefly that Wife's abusive conduct included her telling him not to tell others about the January incident and in that way isolating him from familial support.[8] The argument lacks merit.

Our task on appeal is to determine whether substantial evidence supports the trial court's findings of fact; we do not consider whether substantial evidence might support other possible findings. (*Schmidt*, *supra*,

---

[8] This argument rests on a provision that was added to the Family Code after the hearing in this case. Effective January 1, 2021, " 'disturbing the peace of the other party' " may refer to "coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." (§ 6320, subd. (c), added by Stats. 2020, ch. 248, § 2.) Examples of "coercive control" include "unreasonably . . . [i]solating the other party from friends, relatives, or other sources of support." (§ 6320, subd. (c)(1), added by Stats. 2020, ch. 248, § 2.)

44 Cal.App.5th at pp. 581-582.) In denying Husband's request for a restraining order, the court impliedly found that Wife had not engaged in a pattern of abusive conduct. It is true that Wife testified she tried to delete the recordings because she knew that Husband would use them to follow through on his threat to take the children from her, but there was also testimony from Husband and Wife that at one point Husband told Wife she could delete the recordings. As to the alleged attempt to destroy Husband's phone, there was evidence that Wife did not try to destroy Husband's phone during the January incident, and that his phone was not damaged. Although Husband testified that he was afraid that Wife would physically harm him, the court found credible, based on the parties' testimony, that Husband was *not* physically afraid of Wife.[9] As to Husband's argument that Wife isolated him from familial support, Husband and Wife both testified that Wife asked Husband not to tell family members and their closest friends about the January incident because she was embarrassed about it. But Wife also testified that she encouraged Husband to go to therapy, and couples therapy with her, and to talk to therapists about what had happened in January. Accordingly, the record contains substantial evidence to support the trial court's finding that Husband had not shown a pattern of abusive conduct by Wife.

In sum, Husband fails to show that the trial court abused its discretion in concluding that under the circumstances Wife's conduct did not constitute abuse, and in declining to issue a restraining order against her. Because we conclude that the trial court did not err in finding that Wife had not

---

[9] For example, Husband testified that even after he sought a restraining order, he had asked Wife to "hang out" with him and the children. Wife testified that Husband did not appear to be afraid of her.

14

perpetrated abuse against Husband, we also conclude that the trial court did not err in failing to apply the rebuttable presumption of section 3044 in granting Husband and Wife joint legal and physical custody of the children.

2.      *Granting of Wife's Request for a Restraining Order*

We turn now to Husband's arguments challenging the trial court's issuance of a no-harassment restraining order against him.

a.      *Husband's Request for a DVRO as an Incident of Harassment*

Husband argues that it was legal error for the trial court to find that his filing of a request for a DVRO was itself an incident of harassment. This argument rests on Husband's observation that, by statute, a DVRO may be issued against a spouse or former spouse. (§§ 6211, subd. (a) & 6301, subd. (a).) But the fact that the Family Code authorizes the issuance of a DVRO does not mean that a particular request for a DVRO can never be regarded as evidence of harassment. Whether a request is evidence of harassment depends upon the record.

Here, there was evidence that Husband waited until April to contact the police about actions that Wife took in January; that Wife feared Husband would take the children from her and that he threatened to take the children from her if she did not have sex; and that Husband contacted the police and sought a restraining order asking for full custody of the children only after Wife made it clear that she would no longer agree to have sex every day or make it up on a later date. From all of this, the court could have concluded that Husband filed the restraining order for the purpose of "destroying the mental or emotional calm" of Wife. (*Nadkarni, supra*, 173 Cal.App.4th at p. 1498.)

But even if it were error for the trial court to view Husband filing his request for DVRO as an incident of harassment, Husband fails to show any

15

prejudice from the error because the court found other incidents of harassment, including his treatment of Wife when she would not agree to have sex, per their "marriage contract," or "double tap." Wife testified that the arrangement evolved such that Husband would force her to have sex by preventing her from sleeping. He would sometimes argue with her for hours about the contract after she wanted to go to sleep. About three times, he pulled the covers off to prevent her from sleeping. If she left the room to sleep elsewhere, he would follow her and continue to argue, and if she locked herself in another room, he would pound on the door and continue arguing. These occurrences of what Wife characterized as sleep deprivation to force her to have sex occurred throughout the marriage, on average once per month. More recently, Husband told her that if she didn't have sex with him or agree to "double tap," he would take the children to San Diego. Wife testified she was so scared that he was going to take the children that she took pictures of all their vehicles and license plates to make sure she had photographs for the police if Husband carried out his threat.

In sum, there was substantial evidence that Husband had engaged in a pattern of conduct that harassed Wife and that disturbed her peace by destroying her mental or emotional calm. (*Nakdarni*, *supra*, 173 Cal.App.4th at p. 1498.)

      b.     *The Date of the Audio Recording*

In explaining its ruling, the trial court discussed the parties' audio recording as part of a pattern of harassment. The court concluded that Husband used the recording "as leverage to continue to compel [Wife] to stay in the marriage, because he could use the tape to seek a restraining order and possibly full custody of the children. [¶] . . . [¶] . . . "From [Wife's] perspective, . . . [Husband] was going to use the tape to be able to take the

16

children away from her. . . . [¶] . . . [I]t was taken with her consent, then without her consent. It clearly shows she's admitting to conduct [the January incident] that she's apologetic for. But holding that tape in reserve—it was recorded sometime in January, early February—and not bringing it out until after the police are called, could also be seen—again, he could be preserving his evidence, but also a pattern of exerting leverage on this woman to keep her in the marriage and in the marriage contract."

Husband points out that the parties agreed the recording was made on March 29, and there is no evidence that it was made in January or early February. But Husband fails to show that he was prejudiced by the trial court's reference to the wrong date. To the contrary, he admits that it makes no difference whether the recording was made 12 days before he sought a DVRO or three months before.

Regardless of the exact date the recording was made, there was evidence to support the finding that it was made, at least in part, to exert leverage on Wife. During the conversation, Wife can be heard expressing her belief that Husband would use the recording to try to gain custody of their children should she seek divorce. Wife testified that the recording was made in the evening, when she wanted to sleep, and that she felt pressured to agree to being recorded because for months she had felt that Husband was using the January incident as a leverage point for custody purposes.

But even leaving aside evidence concerning the recording, there is substantial evidence, as we have described, to support the trial court's finding that Husband harassed Wife and disturbed her peace.

c.     *Badgering as Abuse*

Husband contends that even if we view the evidence most favorably toward the trial court's ruling, his behavior to Wife was, "badgering at worst."

17

He argues that under *S.M., supra*, 184 Cal.App.4th at pages 1265-1266, badgering is not a basis for a finding of domestic violence in the absence of a finding that Wife was ever in apprehension of imminent serious bodily injury. Husband's argument disregards the DVPA's expansive definition of "abuse" to include behavior other than physical harm or a threat of physical harm. That definition includes a multitude of behaviors that are not limited to physical harm or destruction or a threat of physical harm or destruction. (§ 6203, subds. (a)(4) & (b); § 6320.) And Husband's reliance on *S.M.* is misplaced.

In *S.M.* the trial court issued a restraining order under the DVPA protecting E.P. (the mother) based solely on a finding that S.M. (the father) had "engaged in badgering." (*S.M., supra*, 184 Cal.App.4th at p. 1266.) The conduct found by the trial court involved a single argument in which S.M. made " 'a very negative comment' " and there was " 'an argument, and essentially he wouldn't stop and was badgering' " E.P. about her plans to travel with the parties' child. (*Ibid.*) The Court of Appeal held that the trial court had abused its discretion by issuing a restraining order without making a finding that S.M.'s conduct rose to the level of harassment or abuse, and further held that the record did not reveal that any such conduct had occurred. (*Ibid.*) The Court of Appeal noted that although the trial court had issued a restraining order, the trial court had made comments demonstrating that it did not believe that S.M.'s conduct met the statutory definition of domestic violence or abuse. (*Id.* at p. 1268.) Specifically, the trial court had indicated that under the circumstances before it, some additional behavior would have been necessary to justify a finding of abuse, such as further incidents of the badgering or conduct that placed E.P. in reasonable apprehension of serious bodily injury. (*Id.* at pp. 1265, 1268.)

This case is far from *S.M.*, where the trial court found that one party had engaged in what it characterized as "badgering" during a single argument. (*S.M.*, *supra*, 184 Cal.App.4th at pp. 1265-1266.) The trial court here found a pattern of harassment and intimidation in the marriage. On this record Husband has not shown that the issuance of a restraining order against him was an abuse of discretion.

## DISPOSITION

The challenged orders are affirmed. Wife shall recover her costs on appeal.

_____
Miller, J.

WE CONCUR:


_____
Richman, Acting P.J.


_____
Mayfield, J.*


A162999, *A.C. v. M.N.*

---

* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.