Filed 12/15/22  In re N.C. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re N.C., a Person Coming Under the Juvenile Court Law. | B315039<br><br>(Los Angeles County Super. Ct. Nos. 21CCJP02527, 21CCJP02527A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>J.C.,<br><br>     Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Steff R. Padilla, Judge Pro Tempore.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, Kelly Emling, Deputy County Counsel for Plaintiff and Respondent.

Father J.C. appeals from juvenile court orders concerning his daughter, N.C. He contends the jurisdictional findings and removal of N.C. from his custody were not supported by substantial evidence. Father further contends the juvenile court abused its discretion by limiting him to monitored visitation and ordering him to attend parenting classes, a program for perpetrators of domestic violence, and individual counseling. He also argues the court abused its discretion by issuing a restraining order protecting N.C.'s mother, D.L., from him because he did not "abuse" mother as the term is defined in the Family Code. We reject these arguments and affirm the orders.

## BACKGROUND

### I.     Initial Incident and Investigation

Father, mother D.L., and then-infant N.C. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in early April 2021, after a domestic dispute between mother and father culminated in mother's arrest. Mother told a children's social worker (CSW) she did not remember much about the incident because she was intoxicated at the time. Mother stated that father "gets extremely insecure" when she drinks with her friends and questions her about her activities, which "results in an argument." Mother also said, however, this was the first time she had drunk alcohol since N.C.'s birth. She denied drug use.

Mother denied previous domestic violence and said father was a "Peace Maker" who was "very 'calm and Zen.'" Mother also

said father was "a very good father"; she had no concerns about him parenting N.C. Mother said she planned to move out of the residence she shared with father.

Father, who suffered scratches to his face, told the CSW that the incident was "a small petty fight" that had come at the end of a "cranky" day filled with bickering. He said mother had been out drinking, and when mother drinks "she gets mad and wants to argue." He also stated, however, that mother "doesn't drink much" and "is a really good mom." Father said this was "the first time it ever got like that," and "nobody has ever sustained an injury." Father was "unsure" about his plans to "move forward" with mother. Father denied drug use in the home, though he stated he smoked marijuana recreationally. Father did not have any criminal history.

The CSW examined N.C. and saw no marks or bruises. N.C., who had special medical needs due to a congenital issue, appeared happy, healthy, and comfortable. Both parents denied that N.C. was present during the incident. Mother said N.C. had been in her crib, while father said N.C. had been in her stroller. The CSW observed the family's apartment to be "very clean and organized" with no safety concerns.

The CSW spoke to the supervisor of security at the family's apartment complex. She stated that mother was a "party type" and father "seems controlling." They had a history of arguing, and she had been called to their apartment "a few times." She added that "it didn't happen a lot, but when it does happen it is over the top." This was the first time the police had been called.

The police report from the incident indicated that the police responded to a call about a verbal argument. They spotted father around the corner from the family's apartment complex, pushing

N.C. in a stroller; he called out, "Help me! Help me!" Officers observed three large scratches deep enough to cause minor bleeding running from father's temple "across the entire left side of his face" to his mouth. Father said mother had scratched him, but he declined medical attention and refused to let the officers photograph the injuries. He also did not want to prosecute or seek an emergency protective order. Father told officers he and mother previously had been involved in a domestic violence incident, while they were on vacation in Florida. Mother was arrested and "placed on mandatory Alcoholics Anonymous meetings and anger management meetings via the courts."

The CSW later determined that mother's criminal history included multiple arrests for battery, an arrest for infliction of corporal injury on a spouse or cohabitant, and an arrest for DUI. Mother informed the CSW that she was on probation "for an altercation a few months ago in Hollywood," but her term had been reduced due to her "being cooperative," and she was "trying to do good for herself." Mother's probation officer told the CSW that, aside from this incident, mother had been compliant with her probation. Mother's anger management therapist also stated that mother was "very cooperative" and showed "some interest in anger management and controlling her emotions." Mother tested positive for marijuana on May 3, 2021.

## II.    Non-Detained Petition

DCFS concluded there were "concerns for domestic violence" sufficient to support intervention. However, because mother was cooperative, accepted responsibility, and was receptive to services, it did not seek to detain N.C. Instead, on May 28, 2021 it filed a "non-detained" petition under Welfare and

Institutions Code section 300, subdivisions (a) and (b)(1).[1] Identical counts a-1 and b-1 alleged that mother and father had a history of engaging in violent altercations in N.C.'s home and had pushed each other on prior occasions. They further alleged that mother injured father's face and was arrested on April 8, 2021, mother had previous convictions for battery, and N.C. was at risk of serious physical harm, damage, and danger. Count b-2 alleged that mother had a history of substance abuse and was a current abuser of alcohol and marijuana; count b-3 alleged that father had a history of substance abuse and was a current abuser of marijuana.

At a June 2, 2021 hearing, the court released N.C. to both parents, who were still living together. The court ordered DCFS to provide family maintenance services. It also ordered DCFS to assess the case for possible dismissal or non-adjudicatory supervision under sections 301 or 360, subdivision (b).

III. **Subsequent Incidents and Removal**

On July 1, 2021, DCFS received another referral concerning the family. When CSWs responded to the apartment complex, the concierge told them there had been "multiple incidents with this family and numerous complaints by neighbors regarding parents fighting/yelling and throwing items inside the apartment." The concierge said incidents occurred on June 21 and 26. Parents stopped arguing when they saw security approaching on June 21, and did not answer the door when police responded to their apartment on June 26. The concierge also reported that she had received complaints that people were

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

smoking marijuana on parents' balcony, but she was unable to confirm parents were smoking. The CSWs spoke to two of parents' neighbors, both of whom reported hearing loud arguments and expressed concern for N.C. One of the neighbors stated that he heard "loud objects being thrown around as well as banging noises."

The incident that prompted the referral occurred on June 30, by the complex's communal swimming pool. According to mother, father had gone out to celebrate a friend's birthday and told her he drank some tequila. She told police father was intoxicated, but later told a CSW that he did not appear to be under the influence when he returned home and the family went to the pool. Father became upset after mother accepted some water from another man at the pool, whom mother described as a "random neighbor." Father yelled at mother and threw furniture into the pool before leaving the area with N.C. Father took N.C. to the family's apartment, where he locked the two of them in the bedroom. When father opened the door to go to the bathroom, mother grabbed N.C. and left. She called the police and also called a friend to pick them up.

The apartment complex concierge shared surveillance video footage of the incident with the CSW. According to the CSW's application for a removal order, "CSW was able to observe father throwing the pool furniture in a moment of rage and [he] was heard saying, 'you don't want to come bitch, you dumbass bitch, you have to come home right, good luck bitch.' As father threw the furniture, CSW observed the baby stroller was behind father. Father was seen throwing the furniture away from the baby stroller. Father then proceeded to grab the stroller and exit the pool area."

The day after the incident, father told the CSW that the pool incident had "nothing to do with his family" and was instead "a simple argument with 'someone.'" He "denied drinking, being under the influence and denied getting aggressive"; he further "denied mother and the child were present at the time of the argument and were together." Father also said, however, that he made sure N.C. was "not caught in the cross fire." He added that he "never blows up like that," and "does not feel that the department should judge him over that video," which "does not define him." Father also asserted that the neighbors were "targeting" the family and blaming them for any loud arguments; he denied objects were ever thrown in the apartment. The CSW noted that she "was able to smell the odor of marijuana on father's person and also when the apartment door was opened," and when she entered parents' bedroom; she had also smelled marijuana on father during a previous visit. Father denied being under the influence. During a previous meeting with the CSW, he stated that he only smoked marijuana while out with friends, and not to the point of getting high.

DCFS obtained authorization to remove N.C. from both parents on July 8, 2021; she was placed with paternal aunt on July 10, 2021. Mother was permitted to stay with them, with a safety plan in place, until paternal aunt received training to meet N.C.'s medical needs. On July 12, 2021, DCFS filed a section 385 petition to formally change N.C.'s placement from home of parents to a suitable placement.

## IV. Detention Hearing and Temporary Restraining Order

The court made emergency detention findings on July 15, 2021 and continued the detention hearing to July 16, 2021. At the hearing, mother's counsel requested that N.C. be released to mother, who had completed some services and enrolled in others. She noted mother had requested a restraining order against father, who had moved out of the family home. Father's counsel submitted on detention and echoed the request that N.C. be released to mother. Father's counsel also requested that N.C. be excluded from the restraining order.

The court declined to release N.C. to either parent, finding that doing so would be contrary to N.C.'s physical, emotional, and psychological wellbeing, given parents' continued engagement in domestic disputes during the pendency of the case. It ordered separate monitored visitation for each of them and gave them referrals for services. The court also granted a temporary restraining order protecting mother from father. The court set the adjudication and restraining order hearing for September 2, 2021.

## V. Jurisdiction/Disposition Report

DCFS filed a jurisdiction/disposition report on August 30, 2021. It reported that a dependency investigator (DI) visited N.C. at paternal aunt's home on August 23, 2021 and observed N.C. to be doing well. The aunt reported that parents visited N.C. consistently and behaved appropriately during visits; N.C. appeared happy to see them. She further noted that both parents "maintained a close bond" with N.C.

The DI also spoke to mother and father about the allegations. Mother declined to make a statement about the

initial incident of domestic violence in April and denied the substance abuse allegations. When asked about the pool incident, mother told the DI that watching the surveillance video of the incident had been "a wakeup call" for her. She said that prior to seeing the video and participating in counseling, she "'would've been justifying [father's behavior] but now I realize that it's not ok.'" Mother stated that father had become "'more aggressive'" with her in approximately June 2021, after she "did some work on her body." She denied he hit her, but admitted that he "threw 'pool chair and multiple things' at her direction," and was "verbally abusive towards her."

Father denied that he and mother had been arguing during the initial incident; he stated that mother "was just reaching for her phone and my face got scratched in the meantime but we were outside, it wasn't in the home." He also stated that he and mother had never pushed one another, as alleged in the petition. Father also denied the substance abuse allegations. When asked about the pool incident, father stated, "'I was just arguing with somebody at the pool and that's it. I don't know who that is. I never met them before.'" Father continued, "'They said something that I didn't like, they started being loud and we argued.'" Father's counsel, who was present during the interview, advised him not to answer further questions about the incident. Father advised the DI that he was visiting N.C. regularly and participating in domestic violence classes.

DCFS recommended that the court sustain the allegations and declare N.C. a dependent of the court. Although parents were visiting N.C. and participating in services, DCFS expressed concern about their "history of violent altercations," father's

9

denial of domestic violence and attempt to "cover up for the mother," and parents' substance use as a contributing factor.

## VI. Adjudication and Disposition Hearing

At the September 2, 2021 adjudication hearing, the court admitted into evidence DCFS's reports and section 385 petition, the surveillance video of the pool incident, a transcript of the surveillance video, and a progress report from father's batterer's intervention program. No party called any witnesses.

Counsel for DCFS urged the court to sustain the petition in its entirety. Counsel for N.C. requested that the court sustain the b-1 allegation regarding domestic violence but dismiss the identical a-1 allegation. She submitted on the substance abuse counts after observing that alcohol, not marijuana, appeared to be an issue. Counsel for mother asserted that mother pled no contest to the b-1 allegation, but argued that the a-1 allegation should be dismissed, and the b-2 allegation concerning mother's substance abuse be stricken. Counsel for father stated she was "joining in mother's counsel's arguments," and asked the court to strike the a-1 allegation. She "submitt[ed] as to the (b)(1) count," contending that the pool incident was "a one-time incident" and that father "threw furniture into the pool rather than at [mother] or near his daughter." Father's counsel argued that the substance abuse allegations were "simply not credible."

The court sustained the b-1 allegation but dismissed the others. It emphasized the severity of the pool incident in its oral remarks: "The video is one of the most shocking videos this court has seen where there's actually not injuries to a child, thank goodness. . . . [¶] But the reason why the court is involved on how adults treat each other is because of the risk to the child and the long-term emotional affect [*sic*] to listening to yelling and

10

screaming. I mean throwing things – if he's not under the influence of drugs or alcohol, then he's just angry because that kind of anger is out of control. [¶] Taking property that doesn't belong to you and throwing it over distances shows either under the influence of drugs or alcohol or complete lack of self-awareness about how angry he is that he is picking up lawn furniture and chucking it here and there. . . . [W]ith a baby carriage not ten feet from him and then calmly – actually, not that calmly – picking up the baby carriage and walking away. [¶] And mother's diminishing of that or minimizing that. . . . [¶] [I]n 21 years on the bench I've never seen lawn furniture being thrown at somebody, and we're talking big lawn furniture with a baby carriage, like I said, less than ten feet away from father, and mother not being able to get near the baby carriage to protect this child because there, standing between the mother, is the father throwing chaise lounges around and other furniture."

At disposition, the court declared N.C. a dependent of the court. It ordered separate, monitored visits for both parents, and gave DCFS discretion to liberalize. The court recognized that both parents had already begun participating in services, but ordered additional reunification services for each of them. As relevant here, it ordered father to participate in a program for perpetrators of domestic violence, parenting classes, and individual counseling.

The court also heard the parties' arguments about extending the restraining order. The court extended the order directing father to stay away from mother for one year, except for peaceful contact at N.C.'s medical appointments and daycare.

Father timely appealed.

11

**DISCUSSION**

## I. Jurisdictional Findings

Father contends the jurisdictional findings were not supported by substantial evidence. He asserts that parents' arguments "were primarily verbal in nature" and did not pose a risk to N.C. at the time of the hearing because parents were participating in services and no longer living together. We disagree.

Juvenile dependency proceedings are intended to protect children who are currently being abused or neglected, "and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) Section 300, subdivision (b)(1) authorizes a juvenile court to exercise jurisdiction over a child if it finds that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's . . . substance abuse." (§ 300, subd. (b)(1).) "A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601.)

"Although section 300 requires proof that the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps

12

necessary to protect the child." (*In re Cole L., supra,* 70 Cal.App.5th at pp. 601-602.) The court may consider past events in determining whether a child presently requires the court's protection, and parents' past conduct may be probative of current conditions if there is reason to believe it will continue. (*Id.* at p. 602.) Because domestic violence impacts children even if they are not the direct victims, exposing children to recurrent domestic violence may be sufficient to establish jurisdiction under section 300, subdivision (b)(1). (*Id.* at pp. 602-603; *In re T.V.* (2013) 217 Cal.App.4th 126, 134.)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" [Citation.]'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Substantial evidence supports the court's jurisdictional findings here. Contrary to father's assertion that parents' arguments were "primarily verbal," substantial evidence in the

13

record showed that mother severely scratched father's face during the initial incident in April 2021, father threw furniture at mother during the pool incident in July 2021, and parents threw objects during multiple arguments in June 2021. Father denies the June incidents, but the court was entitled to credit the contrary statements of the family's neighbors, one of whom said he heard N.C. crying during the arguments. The pool incident was recorded on surveillance video, which the court watched and found troubling. The court was permitted to infer, not only from the escalating nature of the disputes, but also from parents' denials of domestic violence despite documented evidence thereof, that the violence was likely to recur. (*In re V.L.* (2020) 54 Cal.App.5th 147, 156 ["A parent's denial of domestic violence increases the risk of it recurring."].)

Father argues despite the disputes, N.C. was not at risk of harm at the time of the September 2021 adjudication hearing because parents had separated and were receiving services. This argument is not persuasive. DCFS began providing services to the family shortly after the April 2021 incident. Notwithstanding parents' active participation in the services, they continued fighting with one another in N.C.'s presence, escalating their disputes to throwing objects in their apartment and at a communal swimming pool in the presence of others. They are also co-parenting N.C., and both are permitted to attend her medical appointments. Given the public nature of pool incident, and its genesis in father's argument with a "random" man outside the family, the court was permitted to infer that N.C. remained at risk despite the neutrality of the settings in which parents may come into contact.

14

Father contends the facts here are "readily distinguishable" from those of *In re T.V.*, *supra*, 217 Cal.App.4th 126, 134, in which the appellate court affirmed jurisdictional findings based on domestic violence that is "ongoing and likely to continue." We disagree. In *In re T.V.*, father Tyrone punched mother Heather in the face, knocked her to the ground, and stepped on her neck. Child T.V. was not present during that incident. But she told a social worker that she felt scared when her parents fought, and that she had seen them fighting a week prior; she also had been present "during a domestic violence incident between her parents a year earlier at a public library." She stated that she did not want to go back to Tyrone's house due to the fighting. (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 130.) Here, N.C. was too young to talk to social workers. But a neighbor stated he heard her crying during parents' arguments, and she was present during the pool incident. Like the parents in *In re T.V.*, parents here engaged in domestic violence in public spaces despite previous DCFS intervention and continued to minimize the severity of the incidents. Substantial evidence supported the court's finding that N.C. remained at risk at the time of the hearing.

## II.   Dispositional Orders

Father contends the court erred in several aspects of its dispositional orders, by removing N.C. from his custody; requiring him to participate in domestic violence classes, parenting classes, and individual counseling; and limiting him to monitored visitation. We find no error.

### A.    Removal

After a child has been declared a dependent under section 300, the juvenile court "may limit the control to be exercised over the dependent child by any parent" if necessary to protect the

15

child.  (§ 361, subd. (a)(1).)  Section 361, subdivision (c)(1) allows the juvenile court to order a child removed from parental custody if it finds by clear and convincing evidence that the child is, or would be, at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal.  We review the juvenile court's removal order under the substantial evidence standard of review.  (*In re Nathan E.* (2021) 61 Cal.App.5th 114, 123.)  "In reviewing for substantial evidence to support a dispositional order removing a child, we 'keep[ ] in mind that the [juvenile] court was required to make its order based on the higher standard of clear and convincing evidence.'"  (*Ibid.*; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

Father contends the order was not supported by substantial evidence because reasonable means existed to protect N.C. without removing her from his care.  He highlights his participation in services, including domestic violence classes, and his positive interactions with N.C. during visits.  He asserts that the court "should have offered him services to assist him in caring for the minor, such as preservation services, family therapy, or wraparound services."  We disagree.

Prior to seeking removal of N.C., DCFS filed a non-detained petition due to parents' domestic violence.  While that petition was pending, parents engaged in at least three additional incidents, culminating with the furniture-throwing incident at the pool.  Thus, despite intervention and receipt of services, which father asserts would have protected N.C., parents continued to deny the existence of a problem, while placing N.C. at risk.  Substantial evidence supports the court's conclusion that removal was necessary to ensure N.C.'s safety.

16

**B.    Case Plan**

"The juvenile court may make 'all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child.'" (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311, quoting § 362, subd. (a).)  These orders, including the court's determination of services that parents must participate in, may only be reversed where there is a clear abuse of discretion.  (*Ibid.*; § 362, subd. (d).)  Father contends the court abused its discretion by ordering him to participate in domestic violence classes, parenting classes, and individual counseling.  We disagree.

Father argues that he did not need to participate in domestic violence classes because he was not a perpetrator; he claims that "the only time the parents' argument became physical, it was the mother who scratched the father."  He also argues that he did not need individual counseling, because he never injured mother, who he notes described him as "calm and Zen."  Father completely ignores the pool incident, during which he threw furniture at mother while N.C. was mere feet away.  Although neither father nor the furniture struck mother during the incident, the incident indisputably involved father's failure to control his anger in the presence of N.C.  The court did not abuse its discretion in concluding that father and N.C. could benefit from his participation in domestic violence classes and individual counseling to explore these issues.

Father also argues that he did not need parenting classes, because he was bonded with N.C. and visited her regularly, and mother initially told the CSW that she had no concerns about N.C. staying in father's care.  The court did not abuse its discretion by ordering father to attend parenting classes.  Despite his bond with N.C., father threw furniture and other objects in

17

her presence, placing her at risk of harm.  It was reasonable for the juvenile court to conclude that parenting classes could be beneficial in helping father recognize dangers to N.C., and how to moderate his anger around her.

### C.    Visitation

When ordering reunification services, the juvenile court must provide "for visitation between the parent or guardian and the child" that is "as frequent as possible, consistent with the well-being of the child."  (§ 362.1, subd. (a)(1)(A).)  "The power to regulate visits between dependent children and their parents rests with the juvenile court and its visitation orders will not be disturbed on appeal absent an abuse of discretion."  (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1070.)  Father contends the court abused its discretion here by ordering monitored visits, because he "was very protective of the minor and ensured that the parents argued away from the child's presence," "visited the minor consistently and maintained a close bond with her," and "was also participating in domestic violence classes."

Father's assertion that he and mother argued only outside N.C.'s presence is not well taken, given the substantial evidence, including video evidence, to the contrary. N.C. was in a stroller only feet away from him during the pool incident, and could have been  struck with furniture had father aimed poorly.  The juvenile court did not abuse its discretion in ordering monitored visitation for father a mere two months after this incident, which occurred while the family was already working with DCFS.  The juvenile court also recognized that parents already had begun participating in services, and set the matter for a progress hearing to "see what's happening here" and vested DCFS with

18

discretion to liberalize visitation if appropriate.  This was a proper exercise of its discretion.

## III.    Restraining Order

Mother sought, and the court issued, a restraining order protecting her from father. The Domestic Violence Prevention Act (DVPA) (Family Code, § 6200, et seq.) authorizes courts to issue restraining orders to prevent the recurrence of domestic violence and ensure a period of separation for the persons involved.  (*S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1264.)  "The DVPA defines domestic violence as 'abuse' perpetrated against enumerated individuals, including a former spouse or cohabitant."  (*Ibid.*, citing Fam. Code, § 6211, subds. (a), (b).)  For purposes of the DVPA, "abuse" is "not limited the actual infliction of physical injury or assault."  (Fam. Code, § 6203, subd. (b).)  It includes, among other things, "[t]o intentionally or recklessly cause or attempt to cause bodily injury," "[t]o place a person in reasonable apprehension of imminent serious bodily injury to that person or to another" (Fam. Code, § 6203, subds. (a)(1), (a)(3)), and "threatening . . . or disturbing the peace of the other party. . . ." (Fam. Code, §§ 6203, subd. (a)(4), 6320, subd. (a).)  "'[D]isturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party."  (Fam. Code, § 6320, subd. (c).)

Father contends his conduct did not meet the statutory definition of "abuse" because he "in fact threw the pool furniture into the water," which "does not constitute an attack or other type of harassment."  He further asserts that mother was not "placed at [*sic*] fear of imminent serious bodily injury," because he "merely lost his temper and threw pool furniture into the pool."  We review the court's issuance of a restraining order for

19

abuse of discretion, and we find none here.  (*S.M. v. E.P.*, *supra*, 184 Cal.Appp.4th at pp. 1264-1265.)  At the very least, father disturbed mother's (and other pool users') peace by throwing the pool furniture and making offensive remarks.  The court also reasonably could interpret the father's remarks such as "you have to come home right, good luck bitch" as threats to mother, and his "chucking" of the pool furniture in her direction as a reckless attempt to cause bodily injury.

## DISPOSITION

The orders of the juvenile court are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

MANELLA, P. J.

WILLHITE, J.