Filed 12/7/23  R.C. v. I.K. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Modoc)

----

| | |
|---|---|
| R.C., | C096596 |
| Plaintiff and Respondent, | (Super. Ct. No. FL-22-006) |
| v. | |
| I.K., | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

Appellant I.K., a married woman, and R.C. engaged in a sexually intimate affair. When R.C. ended the affair and began dating another woman, (M.L.), I.K. did not take it well.  Over the course of the next year or so I.K. engaged in a course of conduct that began with stopping by R.C.'s residence frequently, which then escalated to barging into the bedroom where R.C. slept in the middle of the night; and included telling R.C's

1

mother that R.C.'s new girlfriend, M.L., was holding R.C. captive, that R.C. was on drugs, and that R.C. was not eating.

At some point, I.K. and her husband, through their business, purchased the building R.C. was using as a residence, and they arranged for an inspection of the building and the posting of a notice of building code violations. Then, on a nearly daily basis over the next two weeks, R.C. would take the notice down and I.K. would come to the residence, look into the windows, and post another copy of the notice.

R.C. sought a domestic violence restraining order against I.K. In the same action, I.K. sought a civil harassment restraining order against R.C. After a two-day trial, the trial court granted R.C.'s request and denied I.K.'s request.

On appeal, I.K. states the issue is "whether a property owner has committed abuse under the Domestic Violence Prevention Act by replacing notices of code violations on her property after [her tenant] repeatedly tore them down." This narrow framing rests on a misconstruction of the range of possible factual findings the trial court might have made in support of its decision. We find that the trial court acted within its discretion when it issued the domestic violence restraining order in favor of R.C. and affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

### Factual Background

Substantial evidence supports the following summary of I.K.'s harassing behavior. (See *Nicole G. v. Braithwaite* (2020) 49 Cal.App.5th 990, 999–1000 [a decision to impose a domestic violence restraining order will not be reversed on appeal if there is substantial evidence to support it].)

I.K. and C.K. (jointly the K.s), wife and husband, met R.C. at a Sunday dinner gathering.

2

In the spring of 2020, the K.s bought Adin Supply Company (the store), and they hired R.C. to do maintenance and repair work as a contractor. Initially, the parties contemplated R.C. would eventually become a partner in the business.

R.C. used a commercial building located across from the store (the building) as his primary residence. When R.C. started living in the building, Mr. and Mrs. S. owned it.

While R.C. was recuperating from knee surgery, he stayed at the K.s' residence for four months. While R.C. was staying at the K.s, R.C. and I.K. began their sexual affair.

M.L. also worked at the store. She had worked at the store under the prior ownership. R.C. and M.L. met at the store. At first R.C. and M.L. just spent time together as friends, but things started to feel like they might get more serious. R.C. told M.L. he would need to clean up his entanglement with I.K. before R.C. and M.L. could start dating.

R.C. broke off his sexual relationship with I.K. I.K. was furious when R.C. ended their sexual relationship.

In late November 2020, R.C. and M.L. began dating.

At first, I.K. would frequently stop by R.C.'s place using pretexts like dropping off his shoes or needing him to fix something. M.L. went to stay at a ranch R.C.'s mother owned to get a breather from I.K.'s regular visits. One night, at 2 a.m., I.K. came into the property with another person. R.C. woke up to the sound of the door opening and heard someone screaming his name. I.K. claimed she had come to check on him because she was worried he was lying in a ditch somewhere.

M.L. learned from other employees at the store that I.K. kept speaking poorly about her with others. M.L. asked I.K. to stop and gave I.K. her two-weeks' notice.

Also, around the time R.C. began dating M.L., the K.s informed R.C. they no longer planned to make him a partner at the store.

R.C. stopped working at the store in January 2021.

3

The K.s banned R.C. and M.L. from the store, which was the only full-service grocery store within about 12 miles. M.L. did not have a car to drive and was getting around on a bicycle.

R.C. testified about various other actions by the K.s that followed that he felt were harassing.

Surveillance cameras on the outside of the store point directly at the building where R.C. was living. R.C. believes there was originally just one camera, but that the K.s later installed a second camera. R.C. felt like the cameras were put up to monitor the building, his residence.

I.K. told R.C.'s mother, S.C., that R.C. was being held captive by M.L. at the family ranch, and that R.C. was doing drugs and not eating. S.C. then drove three to four hours to get to the ranch, and appeared there with a gun, demanding to know what was going on. S.C. later went and spoke with I.K. and said that R.C. and M.L. seemed happy. Later, rumors began to spread, which S.C. believes came out of the store, that S.C. was a gold digger and embezzler and had federal charges filed against her.

At some point early in their relationship, the K.s had loaned R.C. $38,000. According to R.C., the arrangement had been that he would repay the loan by doing work at the store, and the K.s once told him they had forgiven the loan based on all he had done. But according to C.K., R.C. was supposed to repay the loan. In June 2021 the K.s filed an action against R.C. to collect on the loan.

R.C. had reached an agreement with the S.'s to purchase the building, but his plan did not come to be. The K.s offered the sellers more money than R.C. had offered and, through the store, bought the building. I.K. testified they bought the building to use for extra storage.

The K.s contacted the county about inspecting the building and an inspection was scheduled. C.K. posted a 24-hour notice of inspection on the door to the building, and no one otherwise provided notice of the inspection to R.C.

4

The 24-hour notice of inspection has the prior owner's, Mr. S.'s, name typed on the bottom where it is supposed to identify "owner/agent," as opposed to C.K., I.K., or the name of the store. When asked why the prior owner's name was used on the notice, C.K. testified that the prior owner was acting as an agent of the store that day, even though the prior owner was not otherwise affiliated with the store.

On the day of the inspection, the K.s, the prior owners, and the inspector were present and went inside the building. R.C. was not there. The K.s had not notified R.C. that they had purchased the building.

During the inspection, I.K. took pictures, including a photo of a bumper inside the property. I.K. later sent a photo of the bumper to the person she believed owned it.

As a result of the inspection, the inspector created and posted a notice of violation. The notice is dated January 11, 2022.

I.K. asked the inspector for copies of the notice sign, and he declined to provide them. When I.K. asked the inspector if she could make copies of the sign and post those copies if R.C. took the notice sign down, the inspector said something like, "if that's what you want to do, go ahead." The inspector testified he was not giving I.K. any sort of county authority to repost the sign when he said this.

When R.C. saw the notice he took it down.

A cycle began in which R.C. would take down the notice sign, and I.K. would then take a copy she made of it and repost it. I.K. claimed she was reposting the sign because, as an owner, if someone was injured in the building, she would be liable and she wanted to protect her interests. R.C. testified I.K. posted copies of the sign at least 10 times between the date the notice first went up—around January 11, 2022—and the end of January 2022 when he decided to file for a restraining order. R.C. believed the notices were being posted to humiliate him and to make him look bad.

R.C. had a ring camera that captured I.K.'s visits to the building to post copies of the sign. In a video from January 17, 2022, I.K. appears to be waiting around for

5

something. R.C. and M.L. did not know she was outside of the building and went outside. I.K. told R.C. taking down the signs was a misdemeanor. M.L. told I.K. she found I.K.'s behavior to be terrorizing and borderline abusive. R.C. told I.K. to leave.

A ring-camera video from January 18, 2022, shows I.K. giggling when she posted her sign and saying, "I posted my sign on top of one of their signs." The sign she posted in the video is the second one she posted that day.

A video from the next day showed I.K. laughing and skipping away. It also shows the K.s' vehicle parked in front of the building, even though the parking lot at the store had multiple parking spaces.

A video from January 24, 2022, shows I.K. ripping a sign R.C. had made off the side of the building that had said, "[a]ll you need is love."

By January 31, 2022, I.K. had been posting copies of the notice since at least January 17, 2022. A ring-camera video from January 31, 2022, shows her giggling and smiling. I.K. took a long time to tape the notice up. She is seen looking through the window of the building, which R.C. testified she was seen doing on a number of videos of her posting.

After some days of I.K. re-posting copies of the notice, R.C. and M.L. did not want to go outside the front of the building and started going in the back of the building to avoid a confrontation with I.K. R.C. and M.L. were afraid to leave the building.

Shortly after R.C. filed for a restraining order, the K.s had him served with a notice to quit or pay rent on the building. The notice demanded R.C. pay eight-months' rent, $6,400, even though the store had owned the property for less than one month. The K.s had never asked R.C. to pay them rent. C.K. testified he never even notified R.C. of the new ownership, and C.K. admitted he did not know how R.C. was expected to pay rent if he was unaware who owned the building.

In March 2022, the inspector who posted the original notice was made aware that R.C. had been excluded from the building. When R.C. asked the inspector if he was

6

allowed to live in the building despite its condition, the inspector told R.C. he was allowed to stay. The inspector explained it had never been his intention to draw attention to the fact that R.C. could not live in the building. It was, in fact, the owner's responsibility to fix any violations, and not the renter's, and R.C. could stay while they worked to fix the issues.

M.L. testified that she believed I.K. would continue to find avenues to harass R.C. and M.L. if a restraining order was not issued. She identified I.K.'s prior actions as coming in waves and ending in climactic events before pivoting to another set of tactics. The first wave was insisting on in-person contact, which ended with I.K. coming into the house at the ranch at 2 a.m. The second wave was trying to solicit R.C.'s mother to influence him, which ended in the creation of some legal complications for S.C. The final wave was with rounds of legal filings. M.L. said, "it is like, what's next. It's scary to walk out because is she there? Is she going to come out? What if we make eye contact? Is she going to turn that into something bigger or greater?"

Procedural Background

On February 2, 2022, R.C. filed a request for a domestic violence restraining order to protect him and M.L. from I.K. He identified the most recent abuse as I.K.'s entering the property he rented daily between January 11, 2022, and January 30, 2022, to post warning notices, causing him and M.L. to feel terrorized. The petition stated I.K. had engaged in targeted harassment beginning in December 2020, when R.C. broke off a relationship with I.K. and began dating M.L. A temporary domestic violence restraining order protecting R.C. and M.L. from I.K. was issued on that date.

On February 7, 2022, in the same action, I.K. filed a request for a civil restraining order that would protect her and C.K. A temporary civil restraining order protecting I.K. and C.K. from R.C. was issued at that time.

7

The trial court held a bench trial over two days in March 2022 to determine if either party was entitled to a permanent restraining order.

After closing arguments in the trial, R.C.'s counsel asked for a statement of decision on three issues: (1) the credibility of the witnesses; (2) whether I.K.'s conduct of coming across the street to post the notices then staying to talk to R.C. was harassment; and (3) whether I.K.'s continued contact with the California Highway Patrol, Caltrans, the Modoc and Lassen county sheriffs' departments, the county building department, and the county board of supervisors was harassment.

At the time, I.K.'s attorney requested a statement of decision he did not request that additional topics be covered by the statement of decision.

The trial court issued a tentative statement of decision on April 26, 2022. The court identified the three "controverted issues" that R.C.'s counsel had identified as: "whether or not the witnesses were credible; whether or not [I.K.'s] conduct to post notices was harassment; and was continued contact by [I.K.] to the [Sheriff's] Department, Board of Supervisors, CHP and Cal Trans harassment."

The tentative statement then offered specific details regarding its reasoning about the three-specified areas before it provided a more succinct list of its general findings regarding whether the parties had a dating relationship, whether I.K. engaged in acts of harassment, and the nature of R.C.'s actions towards I.K. The tentative statement granted R.C.'s request for a domestic violence restraining order and denied I.K.'s request for a civil restraining order.

I.K. then filed a request to modify or change the statement of decision. Much of I.K.'s request focuses on why she believes the conclusions reached in the tentative statement were incorrect. Notably, regarding her behavior, I.K.'s request focused on how her replacement of the signs did not constitute abuse under statutes governing domestic violence restraining orders. Also, in the final portion of her request to modify the statement, I.K. requested an additional statement that would address the following issues:

8

(1) whether her actions in replacing the signs was justified because a building department representative had "advised her that this was something she could do"; (2) whether her actions in replacing the signs was justified because she was the building's owner and entitled to protect it, its occupants, and its guests; and (3) whether her actions in replacing the building department's signs were constitutionally protected activities that were excluded from activities the court could enjoin.

The trial court issued a proposed statement of decision on May 13, 2022. The proposed statement identified the three issues raised by R.C.'s counsel which it had identified in the tentative statement, as well as the three additional issues I.K. had sought to have addressed in her request.

As it had in the tentative statement, the trial court again provided its explanation detailing its reasoning with respect to the issues the parties had specifically asked it to address.

Regarding the posting of notices as harassment, the trial court explained, "[I.K.] testified that she posted the notice on the building [R.C.] was living in about eight times. [R.C.]'s Exhibit 3, contains approximately 10 or 11 copies of the posted notice. [R.C.]'s Exhibit 9 shows a video of [I.K.] on January 17, 2022, at 18:36 hours posting a notice and Exhibit 4 shows a video of [I.K.] at 18:56 on January 17, 2022, posting another notice. At that time she also looked into the window, slowly walked away from the door, but then came back to engage in conversation with [R.C.] and [M.L.] In Exhibit 7, [I.K.] is shown removing what appears to be a sign from the side of the building and discarding it. [¶] The Court finds that this conduct, the posting of the signs and accompanying behavior, was a pattern of behavior that constituted harassment of [R.C.] and [M.L.] by [I.K.]"

The trial court found that there was insufficient evidence to support the allegation that phone calls were made to officials with the intent to harass R.C.

9

Regarding the question whether I.K.'s actions in posting signs were justified by the building inspector's communications with her, the trial court found that the building inspector had not advised her to continue to post notices, but instead simply responded when she asked if she could "with something like [']do what you want.[']  While that may have led [I.K.] to feel that she could continue to post notices, it was not [the inspector] advising her to continue to post notices."

Regarding whether I.K.'s actions in posting the signs were justified as the owner, the trial court concluded her actions went beyond just protecting her property.  The trial court observed she also looked in windows, waited for M.L. and R.C. to exit the property, and removed a sign.  The trial court concluded she was using the sign posting as an excuse to harass R.C. and M.L. by repeatedly returning to repost the notice.

The trial court also concluded that I.K.'s reposting of the signs was not constitutionally protected activity that was excluded from actions the court could enjoin. The court reiterated that I.K. was not only posting the signs but used that opportunity to go to the property to look in windows, remove a sign posted by R.C., and engage in conversation.

Like it had in its tentative statement, the proposed statement then listed some succinct general findings.  Specifically, it found I.K. and R.C. had an intimate relationship that qualified under statutes that govern domestic violence restraining orders. It found that, "[a] preponderance of the evidence shows that [I.K.] engaged in acts of harassment that qualify as abuse."  It also made findings relevant to I.K.'s request for a civil restraining order.

The proposed statement granted R.C.'s request for a domestic violence restraining order and denied I.K.'s request for a civil harassment restraining order.

On June 10, 2022, the trial court issued a domestic violence restraining order that protected R.C. and M.L. from I.K. for 18 months.

I.K. filed a notice of appeal of July 8, 2022.

10

DISCUSSION

I

*Statutory Background and Principles of Review under the DVPA*

The purpose of the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.) (DVPA) is to "prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence" (Fam. Code, § 6220). The DVPA allows a court to issue a restraining order that enjoins a party from engaging in specific acts of abuse or harassment against a person with whom they had a prior dating relationship or who was a prior cohabitant. (Fam. Code, §§ 6211, subds. (b) & (c); 6218; 6300, subd. (a); 6301, subd. (a); 6320, subd. (a).)

Under the act, abuse is defined in a way that is "not limited to the actual infliction of physical injury or assault" and includes behavior that that can be enjoined pursuant to Family Code section 6320. (Fam. Code, § 6203, subds. (a)(4) & (b).) The behavior identified in Family Code section 6320, subdivision (a), includes, "harassing, . . . destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members." " '[D]isturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly, including through the use of a third party, and by any method or through any means . . . ." (Fam. Code, § 6320, subd. (c).)

"The court's issuance of a protective order under the DVPA is a discretionary matter. ([Fam. Code, ]§ 6300.) ' "A trial court's exercise of discretion will not be disturbed on appeal unless, as a matter of law, an abuse of discretion is shown—i.e.,—

11

where, considering all the relevant circumstances, the court has 'exceeded the bounds of reason' or it can 'fairly be said' that no judge would reasonably make the same order under the same circumstances." ' (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480[].) ' "So long as the court exercised its discretion along legal lines, its decision will not be reversed on appeal if there is substantial evidence to support it." ' (*Ibid.*) We resolve all conflicts in the evidence in favor of the prevailing party, and indulge all legitimate and reasonable inferences in favor of upholding the trial court's findings. (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 31[].)" (*Nicole G. v. Braithwaite, supra,* 49 Cal.App.5th at pp. 999–1000.)

II

*Statements of Decision and Scope of this Appeal*

I.K. claims that, "[t]he facts of the case that" this court "should be concerned with are very limited." She claims the only facts that matter are I.K.'s "repeated replacement of Health and Safety warnings on a property that belong[s] to her." She bases this argument on the fact that in its statement of decision the only facts the trial court elaborated on when it concluded I.K.'s behavior was harassing were the facts surrounding I.K.'s behavior on the days she posted the signs. That is, she treats the fact that the statement of decision does not contain detailed explanations about how I.K.'s other behavior might have contributed to a finding of harassment that qualified for protection under the DVPA as a "reject[ion]" of the possibility that the other behavior was harassing. By framing her appeal in this manner, I.K. ignores how the issues to be addressed in a statement of decision are identified and the impact of a party failing to identify an issue for consideration.

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) Code of Civil Procedure sections 632 and

634 provide a means to avoid application of these inferences in favor of the judgment in the case of a bench trial. (*Ibid.*)

Under section 632 of the Code of Civil Procedure, "In superior courts, upon the trial of a question of fact by the court, . . . [t]he court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial. . . . The request for a statement of decision shall specify those controverted issues as to which the party is requesting a statement of decision. After a party has requested the statement, any party may make proposals as to the content of the statement of decision." Hence, the burden to specify the issues to be addressed in a statement of decision is on the party requesting the statement. (*In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 754, fn. 9.)

"When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court either prior to entry of judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (Code Civ. Proc., § 634.)

"The clear implication of" Code of Civil Procedure section 634 "is that if a party does not bring" omissions or ambiguities "to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards, and hence *the appellate court will imply findings to support the judgment*." (*In re Marriage of Arceneaux*, *supra*, 51 Cal.3d at pp. 1133-1134, italics added.)

Here, when the parties asked the court to address issues in the statement of decision, they focused their requests on the credibility of the witnesses, whether calls to local and state agencies making complaints about the condition of and around the commercial property were harassing, and the posting of the signs. They did not ask for

13

detailed findings regarding whether I.K.'s behavior was sufficient to warrant a protective order in general or the specific impact of any of her other actions. They did not object to an absence of specified findings about I.K.'s other actions as either an omission or ambiguity. On this record, we do not assume the trial court made no findings about that other behavior. Rather, we imply the trial court made findings regarding that behavior that supports the conclusion that, "[a] preponderance of the evidence shows that [I.K.] engaged in acts of harassment that qualify as abuse."

III

*The Trial Court Did Not Abuse Its Discretion in Granting the Restraining Order*

A.    Finding that Behavior Was Harassing

The trial court acted within its discretion when it concluded that I.K. engaged in acts of harassment that qualified as abuse.

As a starting point, we find the trial court acted within its discretion when it concluded that, "the posting of the signs and accompanying behavior, was a pattern of behavior that constituted harassment of [R.C.] and [M.L.] by [I.K.]" Citing *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1266, in which the Fourth District Court of Appeal found an isolated incident of "badgering" did not provide sufficient evidence to support a restraining order, I.K. would have this court believe that the posting of the signs was tantamount to nothing more than badgering. But this argument ignores both the more immediate and greater context in which the signposting occurred.

The posting was not an isolated incident, but, for a substantial period, a daily one. When I.K. posted the signs, she would peer in the windows, and she seemed to be amused by the discomfort her presence and the posting likely caused R.C. and M.L. In one instance, she removed a sign R.C. had put up on the building. In another, she took the opportunity to tell R.C. he faced criminal penalties for removing the signs. R.C. and M.L. began to enter and exit the building in a way that would deliberately minimize their

14

possible contact with and viewing by I.K. Even if we were to ignore all I.K.'s other actions, her behavior when she posted the signs served to destroy "the mental or emotional calm" of R.C. and M.L. in using the space R.C. had made his home. (See Fam. Code, § 6320, subd. (c).)

The trial court's decision stands on even firmer ground when one considers all the other behavior I.K. and C.K. engaged in which the parties did not ask the trial court to specifically address in the statement of decision. At first I.K. was insistent on seeing R.C., going so far as to travel to the place where R.C. and M.L. sought refuge from I.K., then barging in at 2 a.m. When that didn't work, she took actions to make R.C. and M.L.'s life difficult—e.g., talking maliciously about M.L. to people at the store and to R.C.'s mother, and banning both parties from the store. Finally, I.K. and C.K. arranged to purchase the building R.C. used as his home and pursued a course of conduct that seemed designed to make his living there miserable—e.g., the daily posting signs that said the building was unfit to be used as a residence, and demanding months of back rent when they never told him they owned the building—when it was their obligation as owners to remedy the code violations.

Sufficient evidence supports a factual finding that the trial court acted within its discretion to find that I.K. engaged in a pattern of harassing conduct which constituted abuse under the DVPA. The evidence also supports a finding that the posting of the notices was part of the harassing conduct that warranted the order.

B.    Impact on Constitutional Rights

In her reply, I.K. states the issue on appeal is whether I.K.'s "repeated replacement of Health and Safety warnings on a property that belonged to her[ was] enough to warrant the serious constitutional infringements that come along with a domestic violence restraining order?" Above, we have explained why I.K.'s framing is artificially narrow

15

when considering whether the underlying facts support a finding of harassment sufficient to warrant a domestic violence restraining order.

To the extent I.K. is also attempting to argue that the restraining order imposes an overly broad limitation on her constitutional rights, we note that she has failed to fully develop this argument. She does not identify which specific constitutional rights are at issue or the standard for evaluating whether those rights have been impermissibly infringed. She certainly does not engage in a fact-based legal analysis of how we should apply that standard here. Thus, to the extent I.K. attempts to raise an argument that her rights have been impermissibly infringed, she has failed to support that argument with "argument and, if possible, by citation of authority" as required by California Rules of Court, rule 8.204(a)(1)(B). We consider this argument forfeited. (*T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1440, fn. 12 ["We decline to consider this argument, since it is not stated under a separate heading, is not sufficiently developed, and is unsupported by citation to authority"].)

16

DISPOSITION

We affirm the judgment and issuance of the domestic violence protective order. R.C. shall recover his costs on appeal under California Rules of Court, rule 8.278(a).


                                                                _____

                                                               HULL, Acting P. J.


We concur:


_____

RENNER, J.


_____

KEITHLEY, J.*

---

\* Judge of the Butte County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.